Andrew N. Goldman
Charles C. Platt
Michael G. Bongiorno
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel:  (212) 230-8800
Fax: (212) 230-8888

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | |
| **GETTY PETROLEUM MARKETING INC.**, *et al.*, | **Chapter 11** |
| **Reorganized Debtors.** | **Case No. 11-15606 (SCC)** |
| | **Jointly Administered** |
| **ALFRED T. GIULIANO,** | **Adversary Proceeding** |
| as Trustee of The Getty Petroleum Liquidating Trust, | |
| **Plaintiff,** | **No.** |
| -against- | |
| **CAMBRIDGE SECURITIES, LLC, BJORN AASEROD, JOSEPH SCOTT KARRO, and EISENBERG & CARTON** | |
| **Defendants.** | |

## COMPLAINT

In support of this adversary complaint ("the Complaint") brought against Bjorn Aaserod

("Aaserod"), Joseph Scott Karro ("Karro"), Cambridge Securities, LLC ("Cambridge

Securities"), and Eisenberg & Carton ("Eisenberg," and together with Aaserod, Karro, and

Cambridge Securities, the "Defendants"), Plaintiff, Alfred T. Giuliano, as trustee (the "Trustee")

of The Getty Petroleum Liquidating Trust (the "Liquidating Trust"), by and through his

undersigned counsel, respectfully alleges as follows:

## INTRODUCTION

1.      By the commencement of this lawsuit, the Trustee seeks to avoid and recover—

for the benefit of all unsecured creditors of the Getty Petroleum Marketing Inc. ("GPMI")

estate—over $6.5 million in prepetition (and certain postpetition) transfers that were made to, or

for the benefit of, Aaserod and Karro.

2.      Specifically, in the nine month period between Aaserod's and Karro's taking

control of GPMI (which they purchased from Lukoil for $1), and their putting GPMI into chapter

11 on December 5, 2011, Aaserod and Karro caused a woefully insolvent GPMI to transfer

approximately $3,779,972.30 as deposits to nondebtor accounts under their control, to pay for

personal tax obligations, and to pay for personal charges made on GPMI's corporate American

Express card.

3.      GPMI's dire condition cannot be fairly disputed.  Indeed, at the time of Lukoil's

sale of GPMI to Cambridge Petroleum Holding Inc. ("Cambridge Petroleum") (an entity

controlled by Aaserod and Karro), GPMI was so financially ill that Lukoil sold GPMI for $1 and

had to give GPMI an equity infusion of $25 million to stay alive post-closing.  It was grossly

insolvent.

4.      Having acquired GPMI for essentially nothing, and then having appointed

themselves as the sole officers and directors of GPMI, Aaserod and Karro immediately began

using GPMI's remaining few dollars to feather their own nests.  They immediately executed

employment agreements for themselves (each approving of the other's) which contained

lucrative provisions (unpalatable for a company in financial duress), such as above-market base salaries, generous expense allowances and bonuses, and most egregious, the immediate prefunding by GPMI of huge lump sum pension contributions and related tax payments. To add insult to injury, and notwithstanding that their purchase of GPMI did nothing to improve GPMI's condition, they also awarded themselves a "success fee" of $900,000.00—paid again from GPMI's coffers—for buying the company, and reimbursed themselves, using GPMI's funds, for unspecified alleged expenses related to the sale in the amount of $91,000.00. And finally, Aaserod then began using GPMI's corporate credit card for his family's personal expenditures (including approximately $67,622.30 in flights for himself and his wife and daughters to travel on multiple occasions to Europe and other international destinations).

5.      Aaserod's and Karro's behavior did not end when GPMI filed for chapter 11. To the contrary, Aaserod and Karro—without the prior knowledge of the Creditors' Committee— continued to pay themselves a total of $190,712.00 in pension contributions post-filing. While Aaserod and Karro clearly benefitted from these transfers, GPMI received nothing in return. Instead, GPMI had precious assets (*i.e.*, cash) removed from its accounts—cash that could have been used to fund operations, and/or to pay creditors—to fund these pension payments.

6.      In total, GPMI paid—on account of the transactions described above— $3,970,684.30 to or for Aaserod's and Karro's benefit during their tenure as owners of GPMI. Notably, this amount does <u>not</u> include the combined $100,000 per month in salary paid to Aaserod and Karro or payments made to cover the health and other benefits and generous allowances for business expenses that Aaserod and Karro granted to themselves in their Service Agreements. The Trustee is not at this time seeking to avoid and recover those payments.

7.     In addition to siphoning assets out of GPMI, Aaserod and Karro caused GPMI's wholly-owned nondebtor subsidiary, Cambridge Petroleum Headquarters LLC ("Cambridge Headquarters")—an entity also controlled exclusively by Aaserod and Karro—to make $2,562,500.00 in payments directly to them or for their own personal benefit while Cambridge Headquarters was insolvent.  Like the transfers by GPMI, the payments by Cambridge Headquarters were often made directly to Cambridge Securities, for the benefit of Aaserod and Karro, who, on information and belief, were also the subsequent transferees of many of those payments.  One of the payments made by Cambridge Headquarters was made to Eisenberg, for the benefit of Cambridge Securities, Aaserod, and/or Karro.  As with the transfers made by GPMI, Cambridge Headquarters received nothing in return for the payments.  In addition to being Cambridge Headquarters' parent, GPMI was (and still is) a creditor of Cambridge Headquarters on account of intercompany balances owed by Cambridge Headquarters.

8.     As set forth below, Aaserod and Karro, as the persons for whose benefit the GPMI transfers were made, and as the initial or subsequent transferees of many of the transfers, are liable for repayment of the amounts of the transfers.  The utter lack of value received by GPMI in exchange for the payments renders them voidable and recoverable as fraudulent conveyances under sections 273 through 275 and section 278 of the New York Debtor and Creditor Law ("NYDCL") and sections 544, 548, and 550 of the Bankruptcy Code.  To the extent that the employment agreements they rubber stamped for one another constitute valid agreements creating antecedent debts, Aaserod and Karro are also liable for the repayment of these amounts as preferential transfers under section 547 of the Bankruptcy Code.  Cambridge Securities, the entity designated by Aaserod and Karro to receive payments directly from GPMI for their benefit, is likewise liable under those provisions as the initial transferee of many of the

same payments. The transfers made by Cambridge Headquarters are avoidable as fraudulent transfers under section 541 of the Bankruptcy Code and sections 273 through 275 and section 278 of the NYDCL by the Trustee in his capacity as a creditor of Cambridge Headquarters.

## JURISDICTION AND VENUE

9.      This adversary proceeding (the "Adversary Proceeding") arises in and relates to GPMI's chapter 11 case, commenced by voluntary petition on December 5, 2011 (the "Petition Date"). The Court thus has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

10.     The claims and causes of action asserted in this Complaint constitute core proceedings pursuant to 28 U.S.C. § 157(b); in accordance with Local Bankruptcy Rule 7012-1, the Trustee consents to the entry of final orders or judgment by a bankruptcy judge if it is determined that a bankruptcy judge, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Additionally, Aaserod and Karro have filed proofs of claim in GPMI's chapter 11 cases; accordingly, the claims brought against them herein are subject to final orders by this Court, and they have submitted themselves to the Court's jurisdiction for adjudication of all matters relating thereto.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a) because this proceeding arises in, and is related to, GPMI's bankruptcy cases pending in this District.

12.     The statutory bases for relief in this Adversary Proceeding are sections 502, 541, 544, 547, 548, 549 and 550 of the Bankruptcy Code and sections 273 through 275 and section 278 of the NYDCL.

## THE PARTIES

13.     On August 24, 2012, the Bankruptcy Court entered an order pursuant to section 1129 of the Bankruptcy Code confirming the chapter 11 plan of liquidation (the "Plan") of GPMI and its debtor affiliates.  The Effective Date of the Plan occurred on September 24, 2012. Pursuant to the Plan and the order confirming the Plan, the Liquidating Trust was established, the appointment and designation of the Trustee was approved, and the Liquidating Trust Assets (as defined in the Plan), including the claims and causes of actions set forth herein, were assigned, conveyed and transferred to the Liquidating Trust.  The Trustee has standing and all due authority to bring the claims contained herein on behalf of the Liquidating Trust.

14.     During its corporate life, GPMI was a corporation organized under the laws of the state of Maryland and had its principal place of business in East Meadow, New York.  Until February 28, 2011, GPMI was a wholly owned subsidiary of one of the entities within the OAO Lukoil family of companies (for ease of reference herein, "Lukoil").  On February 28, 2011, Cambridge Petroleum purchased all of the shares of GPMI (the "GPMI Purchase") from Lukoil.

15.     Cambridge Petroleum purchased GPMI for $1, plus Lukoil's promise to infuse $25 million into GPMI to allow it to avoid operational collapse.

16.     By way of the GPMI Purchase, Cambridge Petroleum also became the indirect parent of GPMI's four wholly owned subsidiaries.  These included PT Petro Corp., Gasway, Inc., Getty Terminals, Corp., and Lukoil Americas Headquarters, Inc.  Following the GPMI Purchase, Lukoil Americas Headquarters, Inc.—which owned the building in East Meadow out of which GPMI operated—was renamed Cambridge Headquarters.

17.     Defendant Cambridge Securities is a limited liability corporation organized under the laws of the state of Delaware and has its principal place of business in New York, New York.

18.     Defendant Bjorn Aaserod is the chairman of the board of directors of Cambridge Petroleum, on information and belief, the managing member of Cambridge Securities, and, from the GPMI Purchase until September 1, 2012, was the Chairman of the Board of Directors and Chief Executive Officer of GPMI and each of its subsidiaries.

19.     Defendant Joseph Scott Karro is a member of the board of directors of Cambridge Petroleum and is its corporate secretary, and from the GPMI Purchase until September 1, 2012, was the CFO of GPMI and each of its subsidiaries.

20.     Defendant Eisenberg & Carton is a law practice with its place of business in Melville, New York.  Eisenberg represented Cambridge Securities, Aaserod and/or Karro in connection with various legal matters.

**FACTUAL ALLEGATIONS**

**A.     Background**

21.     Prior to the Petition Date, GPMI marketed and sold gasoline and diesel fuel to consumers through a network of gasoline service stations, primarily in the Northeastern and Mid-Atlantic states.  GPMI was insolvent for years prior to its bankruptcy filing, in large part as a result of two contracts that proved to be very unfavorable to GPMI: a master lease agreement covering hundreds of properties and a long term supply agreement for ethanol.  GPMI leased or subleased 836 service stations from Getty Realty, Inc. ("Getty Realty") under a Master Lease Agreement ("the Master Lease") with Getty Properties Corp.  By at least 2007, the service stations subject to the Master Lease had come to generate negative earnings and negative cash flow, as measured by the difference between the rent expenses allocated by GPMI to those properties and the revenue generated by gas and other services. The service stations leased or subleased from Getty Realty are referred to herein as the "Master Lease Assets."

7

22.     In September 2006, GPMI entered into a long-term ethanol-supply agreement (as amended and restated on August 7, 2007, the "Bionol Contract") with Bionol Clearfield LLC ("Bionol"), pursuant to which Bionol was to produce and sell ethanol to GPMI under a pricing formula that was intended to reflect the costs that Bionol would incur to produce the ethanol purchased by GPMI.  Shortly after GPMI entered into the Bionol Contract, the ethanol market started rapidly to decline, and the price that GPMI was scheduled to pay under the Bionol Contract quickly rose well above current market prices.

23.     Throughout 2008 and 2009, GPMI had to rely on Lukoil to provide cash infusions so that it could remain a going concern and pay debts as they became due.  Otherwise, GPMI would have been unable to issue clean, "unqualified" audit letters.  A draft September 30, 2008 Management Discussion & Analysis showed an "accumulated deficit of approximately $53.5 million" for GPMI and stated that GPMI's "ability to meet its financial obligations and continue as a going concern is dependent on the financial support of Lukoil."

24.     In November 2009, GPMI's parent companies caused GPMI to effect a restructuring pursuant to which all of GPMI's cash-generating assets were transferred to a GPMI affiliate at below market value, leaving GPMI with only unprofitable assets, principally the Master Lease Assets, and its obligations under the Bionol Contract.  The cash proceeds from the sale were used to pay down long term debt guaranteed by Lukoil.

25.     Aaserod and Karro, through Cambridge Petroleum, acquired GPMI from Lukoil through the GPMI Purchase on February 28, 2011.  Lukoil received $1 in cash from the transaction, and in fact itself paid Cambridge Petroleum $25 million in the form of a cash equity infusion to take GPMI off of Lukoil's hands.  At the time of the acquisition, GPMI's new

management was quoted in the press as disclaiming GPMI's ability to meet any of its obligations under the Master Lease.

26.     GPMI was undoubtedly insolvent at the time Aaserod and Karro, through Cambridge Petroleum, purchased the company.  In February 2011, GPMI consisted only of money-losing assets and faced potential judgments against it in litigation with its landlord, Getty Realty, and ongoing litigation with Bionol regarding the Bionol Contract.

27.     In the spring of 2011, a dispute arose between GPMI and Bionol over the Bionol Contract.  GPMI commenced an arbitration proceeding to resolve the dispute.  After an eleven-day arbitration hearing, on July 22, 2011, the American Arbitration Association issued an arbitration award *against* GPMI in the amount of approximately $230 million.  On this news, GPMI began preparing for bankruptcy.

**B.    GPMI's Chapter 11 Case**

28.     On the Petition Date, GPMI and its affiliated debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court (the "Bankruptcy Case").  Cambridge Headquarters, one of GPMI's subsidiaries, did not file for relief and did not become a debtor in the Bankruptcy Case.

29.     Since his appointment, the Trustee has assumed responsibility for the litigation of avoidance actions and is pursuing those causes of action for the benefit of creditors.  The Trustee is also in the process of evaluating and objecting to claims in GPMI's chapter 11 cases.  There are currently more than 2,000 scheduled and filed claims totaling over $750 million, and the Trustee currently estimates that distributions to general unsecured creditors will be well below 20%.

30.     Aaserod filed several proofs of claim in the Bankruptcy Case, including claim numbers 863, 876, 877, and 878 (the "Aaserod Claims").  The Aaserod Claims include claims for postpetition compensation and indemnification claims for tax obligations.  Aaserod filed no other prepetition, or administrative, proofs of claim, and the bar dates for both have long since passed.

31.     Karro also filed several proofs of claim in the Bankruptcy Case, including claim numbers 874, 875, and 879, and GPMI listed amounts owing to Karro on its bankruptcy schedules (the "Karro Claims").  The Karro Claims include claims for postpetition compensation and indemnification claims for tax obligations.  Karro filed no other prepetition, or administrative, proofs of claim, and the bar dates for both have long since passed.

**C.      Payment of Pension Benefits and Tax Obligations by GPMI**

32.     At the time of the closing of the GPMI Purchase, Aaserod and Karro each entered into separate Service Agreements with GPMI and its subsidiaries (the "Aaserod Service Agreement" and the "Karro Service Agreement," respectively).

33.     The Aaserod Service Agreement provided that Aaserod would serve as CEO of the Company (defined in the Aaserod Service Agreement to include GPMI and each of its subsidiaries).  In addition to a base salary of $60,000 per month, discretionary bonuses, and other benefits, the Aaserod Service Agreement provided that the Company would provide an initial pension contribution of $1,200,000 for an annuity, as directed by Aaserod.  The Aaserod Service Agreement also provided that the Company would be responsible for the payment of all taxes incurred by Aaserod arising from the pension contribution.  Karro executed the Aaserod Service Agreement on behalf of GPMI and each of its subsidiaries.

34.     The Aaserod Service Agreement provided that Aaserod could designate a company under his control as the payee of amounts to be paid under the Aaserod Service Agreement.  On information and belief, Cambridge Securities was designated as the payee of amounts to be paid under the Aaserod Service Agreement.

35.      The Karro Service Agreement provided that Karro would serve as CFO of the Company (defined in the Karro Service Agreement to include GPMI and each of its subsidiaries).  In addition to a base salary of $40,000 per month, discretionary bonuses, and other benefits, the Karro Service Agreement provided that the Company would provide an initial pension contribution of $600,000 for an annuity, as directed by Karro.  The Karro Service Agreement also provided that the Company would be responsible for all taxes incurred by Karro arising from the pension contribution.   Aaserod executed the Karro Service Agreement on behalf of GPMI and each of its subsidiaries.

36.     The Karro Service Agreement provided that Karro could designate a company under his control as the payee of amounts to be paid under the Karro Service Agreement.  On information and belief, Cambridge Securities was designated as the payee of amounts to be paid under the Karro Service Agreement.

37.     Pursuant to the Stipulation and Order Relating to Compensation of Certain of the Debtors' Executives [Docket No. 533], the Aaserod Service Agreement and the Karro Service Agreement were deemed rejected, pursuant to section 365 of the Bankruptcy Code, as of September 1, 2012.

38.     Within ninety days prior to the Petition Date, GPMI transferred $1.8 million to Cambridge Securities to fund Aaserod's and Karro's initial pension contributions pursuant to the Aaserod Service Agreement and the Karro Service Agreement.  Of the $1.8 million paid by

GPMI for the pension obligations, $1.2 million was paid for the benefit of Aaserod (the "Aaserod Pension Payment") and $600,000 was paid for the benefit of Karro (the "Karro Pension Payment"). On information and belief, Aaserod received the Aaserod Pension Payment and Karro received the Karro Pension Payment, as subsequent transferees of Cambridge Securities. The details of the Aaserod Pension Payment and the Karro Pension Payment are set forth in Exhibit A, under the headings Aaserod Pension Payment and Karro Pension Payment.

39. In connection with the Aaserod Pension Payment and the Karro Pension Payment, and also within 90 days prior to the Petition Date, GPMI transferred a total of $921,350.00 to various taxing authorities, including the United States Treasury, New York State Income Tax, NYC Department of Finance, and the Commissioner of Taxation and Finance, in payment of tax obligations relating to Aaserod's and Karro's pensions. GPMI's Statement of Financial Affairs ("SOFA") describes these payments as "Tax Gross Up payments for Retirement Pension Plan." Of the $921,350.00 paid by GPMI as part of the tax gross up payments, $621,350.00 was paid for the benefit of Aaserod (the "Aaserod Tax Gross Up Payments") and $300,000.00 was paid for the benefit of Karro (the "Karro Tax Gross Up Payments"). The details of the Aaserod Tax Gross Up Payments and the Karro Tax Gross Up Payments are set forth in Exhibit A, under the headings Aaserod Tax Gross Up Payments and Karro Tax Gross Up Payments.

40. GPMI did not receive any value (let alone reasonably equivalent value) or fair consideration in exchange for the Aaserod Pension Payment, the Karro Pension Payment, the Aaserod Tax Gross Up Payments, or the Karro Tax Gross Up Payments.

**D.    Project Octane Payments by GPMI**

41. GPMI also paid to Cambridge Securities, on information and belief, for the benefit of Aaserod and Karro, a total of $991,000.00 allegedly relating to their role in the sale of

12

GPMI, a project referred to among the parties as "Project Octane" (the "Project Octane Payments"). $91,000.00 of the Project Octane Payments was paid in March 2011, allegedly for accrued transaction expenses. The remaining $900,000.00 of the Project Octane Payments, which, according to an invoice submitted by Aaserod and Karro, constituted a "success fee" pursuant to an agreement dated December 15, 2010, was paid in September 2011. On information and belief, both of the Project Octane Payments were paid by GPMI for the benefit of both Aaserod and Karro. On information and belief, Aaserod and/or Karro received the Project Octane Payments, as subsequent transferees of Cambridge Securities. In sum, Aaserod and Karro paid themselves—out of GPMI's coffers—$991,000 for taking GPMI off of Lukoil's hands for $1, and GPMI received no value or consideration in return. The details of the Project Octane Payments are set forth in Exhibit A, under the heading Project Octane Payments.

**E.      Credit Card Payments by GPMI**

42.      Between July 2011 and November 2011, GPMI made transfers totaling $67,622.30 (the "AMEX Payments") to American Express to pay for charges incurred by Aaserod on GPMI's corporate credit card. On information and belief, the AMEX Payments paid charges that served no business purpose, but were instead personal expenditures of Aaserod, primarily travel for Aaserod and his family to Italy and other international destinations as set forth on Exhibit B. Accordingly, the transfers solely benefitted Aaserod, and GPMI received no value or consideration in return. The details of the AMEX Payments are set forth in Exhibit A, under the heading AMEX Payments.

**F.     Transfers by Cambridge Headquarters**

43.     Cambridge Headquarters is the wholly-owned subsidiary of GPMI.  On information and belief, at all times relevant to the Complaint, Cambridge Headquarters was controlled by Aaserod and Karro.

44.     According to documents filed by GPMI with the Court, at all times relevant to the Complaint, Cambridge Headquarters was indebted to GPMI on account of an intercompany payable.  According to the Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Estate of Getty Petroleum Marketing Inc. Holds a Substantial or Controlling Interest (Form B26), dated September 7, 2012, signed by Karro, and filed with the Court [Docket No. 729], the amount of the intercompany payable was $2,197,000 as of December 31, 2011 and $2,108,000 as of August 31, 2012.  On information and belief, Cambridge Headquarters remains indebted to GPMI in the amount of at least $2,108,000.00.

45.     According to its records, Cambridge Headquarters made a total of $633,000.00 in additional pension contributions in January and August 2012, even though Cambridge Headquarters conducted no business and had no operations (other than serving as the shell holding company for the headquarters real estate).  Cambridge Headquarters paid $236,000.00 to Karro (the "Headquarters Karro Pension Payment") and $397,000.00 to Cambridge Securities, on information and belief for the benefit of Aaserod and/or Karro (the "Additional Headquarters Pension Payments").  On information and belief, Aaserod and/or Karro received the Additional Headquarters Pension Payments as subsequent transferees of Cambridge Securities.  The details of the Headquarters Karro Pension Payment and the Additional Headquarters Pension Payments are set forth in Exhibit A, under the headings Headquarters Karro Pension Payment and Additional Headquarters Pension Payments.

14

46. According to its records, Cambridge Headquarters made a total of $329,500.00 in tax payments for the benefit of Aaserod and Karro. Cambridge Headquarters' records describe these payments as "additional tax gross up payment[s]." Of the $329,500.00 paid by Cambridge Headquarters as part of the tax gross up payments, $212,550.00 was paid to Cambridge Securities for the benefit of Aaserod (the "Headquarters Aaserod Tax Gross Up Payment"), who, on information and belief, received the Headquarters Aaserod Tax Gross Up Payment as a subsequent transferee. The remaining $116,950.00 was paid directly to Karro (the "Headquarters Karro Tax Gross Up Payment"). The details of the Headquarters Aaserod Tax Gross Up Payment and the Headquarters Karro Tax Gross Up Payment are set forth in Exhibit A, under the headings Headquarters Aaserod Tax Gross Up Payment and Headquarters Karro Tax Gross Up Payment.

47. Cambridge Headquarters made three transfers to Cambridge Securities in November and December 2011—just days before GPMI filed its petition—in the amounts of $450,000.00, $550,000.00, and $250,000.00 (the "Headquarters Securities Payments"). On information and belief, Aaserod and/or Karro were subsequent transferees and/or beneficiaries of the Headquarters Securities Payments. On information and belief, Cambridge Headquarters did not receive reasonably equivalent value or fair consideration for the Headquarters Securities Payments. The details of the Headquarters Securities Payments are set forth in Exhibit A, under the heading Headquarters Securities Payments.

48. Cambridge Headquarters made a transfer to Eisenberg, two days before GPMI filed its petition, in the amount of $350,000.00 (the "Eisenberg Payment"). On information and belief, the Eisenberg Payment was made in connection with legal services that benefitted Cambridge Securities, Aaserod, and/or Karro and not Cambridge Headquarters. On information

and belief, Cambridge Headquarters did not receive reasonably equivalent value or fair consideration for the Eisenberg Payment. The details of the Eisenberg Payment are set forth in Exhibit A, under the heading Eisenberg Payment.

49. According to its records, Cambridge Headquarters was insolvent at the time of the Headquarters Karro Pension Payment, the Additional Headquarters Pension Payments, the Headquarters Aaserod Tax Gross Up Payment, the Headquarters Karro Tax Gross Up Payment, the Headquarters Securities Payments, and the Eisenberg Payment, at all times relevant to the Complaint.

50. On information and belief, Cambridge Headquarters received no value or consideration (let alone fair or reasonably equivalent value) in exchange for the Headquarters Karro Pension Payment, the Additional Headquarters Pension Payments, the Headquarters Aaserod Tax Gross Up Payment, the Headquarters Karro Tax Gross Up Payment, the Headquarters Securities Payments, or the Eisenberg Payment.

**G.      Post-Petition Pension Payments by GPMI**

51. According to documents filed by GPMI with the Court and GPMI's records, GPMI made additional pension contributions for Aaserod and Karro after the Petition Date. On May 24, 2012, GPMI paid $69,085.00 to Karro for what is described in GPMI's records as a "pension payment" (the "Post-Petition Karro Pension Payment"). On May 25, 2012, GPMI paid $121,627.00 to Cambridge Securities for the benefit of Aaserod (the "Post-Petition Aaserod Pension Payment"), who, on information and belief, received the Post-Petition Aaserod Pension Payment as a subsequent transferee. On information and belief, the Post-Petition Karro Pension Payment and the Post-Petition Aaserod Pension Payment were not authorized by the Court, nor was the Creditors' Committee informed in advance of these "out of the ordinary course"

payments, and they were made at a time when—as the Court knows—GPMI was teetering on the verge of conversion to chapter 7, having been unable to make even base rent payments to Getty Realty during the pendency of the case. The details of the Post-Petition Karro Pension Payment and the Post-Petition Aaserod Pension Payment are set forth in Exhibit A, under the headings Post-Petition Karro Pension Payment and Post-Petition Aaserod Pension Payment.

**COUNT I**
**(11 U.S.C. § 548(a)(1)(B))**
**AVOIDANCE OF THE AASEROD PENSION PAYMENT AS A CONSTRUCTIVE FRAUDULENT TRANSFER**
**(AS TO CAMBRIDGE SECURITIES)**

52. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

53. On or within two years prior to the Petition Date, GPMI made the Aaserod Pension Payment to Cambridge Securities in the aggregate amount of $1,200,000.00, as set forth on Exhibit A, under the heading Aaserod Pension Payment.

54. The Aaserod Pension Payment was made for the benefit of Aaserod.

55. The Aaserod Pension Payment was a transfer of an interest in GPMI's property.

56. GPMI received less than reasonably equivalent value in exchange for the Aaserod Pension Payment.

57. The Aaserod Pension Payment was made (a) at a time when GPMI was engaged or was about to engage in a business and transactions for which the remaining assets of GPMI were unreasonably small in relation to the business and transactions, (b) at a time when GPMI intended to incur, or believed or should reasonably have believed that it would incur, debts beyond its ability to pay as they became due, (c) at a time when GPMI was insolvent, or (d) with the result that GPMI became insolvent as a result of the Aaserod Pension Payment.

58.	At the time of the Aaserod Pension Payment, Aaserod was an insider of GPMI, as defined by 11 U.S.C. § 101(31).

59.	The Aaserod Pension Payment was made under an employment agreement—the Aaserod Service Agreement—and not in the ordinary course of GPMI's business.

60.	Neither Cambridge Securities nor Aaserod gave reasonably equivalent value to GPMI in exchange for the Aaserod Pension Payment and they did not receive the Aaserod Pension Payment in good faith.

61.	The Aaserod Pension Payment is avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

**COUNT II**
**(11 U.S.C. § 548(a)(1)(B))**
**AVOIDANCE OF THE AASEROD PENSION PAYMENT AS A CONSTRUCTIVE FRAUDULENT TRANSFER**
**(AS TO AASEROD)**

62.	The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

63.	On or within two years prior to the Petition Date, GPMI made the Aaserod Pension Payment to Cambridge Securities in the aggregate amount of $1,200,000.00, as set forth on Exhibit A, under the heading Aaserod Pension Payment.

64.	The Aaserod Pension Payment was made for the benefit of Aaserod.

65.	The Aaserod Pension Payment was a transfer of an interest in GPMI's property.

66.	GPMI received less than reasonably equivalent value in exchange for the Aaserod Pension Payment.

67.	The Aaserod Pension Payment was made (a) at a time when GPMI was engaged or was about to engage in a business and transactions for which the remaining assets of GPMI

18

were unreasonably small in relation to the business and transactions, (b) at a time when GPMI intended to incur, or believed or should reasonably have believed that it would incur, debts beyond its ability to pay as they became due, (c) at a time when GPMI was insolvent, or (d) with the result that GPMI became insolvent as a result of the Aaserod Pension Payment.

68. At the time of the Aaserod Pension Payment, Aaserod was an insider of GPMI, as defined by 11 U.S.C. § 101(31).

69. The Aaserod Pension Payment was made under an employment agreement—the Aaserod Service Agreement—and not in the ordinary course of GPMI's business.

70. Neither Cambridge Securities nor Aaserod gave reasonably equivalent value to GPMI in exchange for the Aaserod Pension Payment and they did not receive the Aaserod Pension Payment in good faith.

71. The Aaserod Pension Payment is avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

## COUNT III
### (11 U.S.C. § 544(b) AND N.Y. DEBT. & CRED. §§ 273, 274, 275)
### CONSTRUCTIVE FRAUDULENT CONVEYANCE: AASEROD PENSION PAYMENT
### (AS TO CAMBRIDGE SECURITIES)

72. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

73. Section 544(b) of the Bankruptcy Code permits the Trustee to assert claims and causes of action that a creditor could assert under applicable state law. At all relevant times there have been one or more creditors that have held and still hold matured or unmatured unsecured claims against GPMI that were and are allowable under section 502 of the Bankruptcy Code.

74. GPMI made the Aaserod Pension Payment to and for the benefit of Cambridge Securities.

19

75.     The Aaserod Pension Payment was also made for the benefit of Aaserod.

76.     Aaserod was the subsequent transferee of the Aaserod Pension Payment.

77.     The Aaserod Pension Payment was made on or within six (6) years prior to the date of the Complaint, as reflected on Exhibit A, under the heading Aaserod Pension Payment.

78.     The Aaserod Pension Payment constituted a conveyance of property of GPMI.

79.     The Aaserod Pension Payment was made (a) at a time when the present fair saleable value of GPMI's assets was substantially less than the amount that would have been required to pay GPMI's probable liability on its debts as they became due and matured, (b) at a time when GPMI was engaged or about to engage in a business or transactions for which the property remaining in GPMI's hands was unreasonably small, (c) at a time when GPMI intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when GPMI was insolvent, and/or (e) with the result that GPMI became insolvent as a result of the Aaserod Pension Payment.

80.     Neither Cambridge Securities nor Aaserod gave reasonably equivalent value or fair consideration to GPMI in exchange for the Aaserod Pension Payment and they did not receive the Aaserod Pension Payment in good faith.

81.     The Aaserod Pension Payment was fraudulent as to GPMI's creditors.

82.     The Aaserod Pension Payment is avoidable as a fraudulent transfer pursuant to section 544 of the Bankruptcy Code and New York Debtor and Creditor Law §§ 273, 274, and/or 275.

## COUNT IV
### (11 U.S.C. § 544(b) AND N.Y. DEBT. & CRED. §§ 273, 274, 275)
### CONSTRUCTIVE FRAUDULENT CONVEYANCE: AASEROD PENSION PAYMENT
### (AS TO AASEROD)

83.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

84.     Section 544(b) of the Bankruptcy Code permits the Trustee to assert claims and causes of action that a creditor could assert under applicable state law.  At all relevant times there have been one or more creditors that have held and still hold matured or unmatured unsecured claims against GPMI that were and are allowable under section 502 of the Bankruptcy Code.

85.     GPMI made the Aaserod Pension Payment to and for the benefit of Cambridge Securities.

86.     The Aaserod Pension Payment was also made for the benefit of Aaserod.

87.     Aaserod was the subsequent transferee of the Aaserod Pension Payment.

88.     The Aaserod Pension Payment was made on or within six (6) years prior to the date of the Complaint, as reflected on Exhibit A, under the heading Aaserod Pension Payment.

89.     The Aaserod Pension Payment constituted a conveyance of property of GPMI.

90.     The Aaserod Pension Payment was made (a) at a time when the present fair saleable value of GPMI's assets was substantially less than the amount that would have been required to pay GPMI's probable liability on its debts as they became due and matured, (b) at a time when GPMI was engaged or about to engage in a business or transactions for which the property remaining in GPMI's hands was unreasonably small, (c) at a time when GPMI intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when GPMI was insolvent, and/or (e) with the result that GPMI became insolvent as a result of the Aaserod Pension Payment.

91.     Neither Cambridge Securities nor Aaserod gave reasonably equivalent value or fair consideration to GPMI in exchange for the Aaserod Pension Payment and they did not receive the Aaserod Pension Payment in good faith.

92.     The Aaserod Pension Payment was fraudulent as to GPMI's creditors.

93.     The Aaserod Pension Payment is avoidable as a fraudulent transfer pursuant to section 544 of the Bankruptcy Code and New York Debtor and Creditor Law §§ 273, 274, and/or 275.

**COUNT V**
**(11 U.S.C. § 547)**
**AVOIDANCE OF THE AASEROD PENSION PAYMENT AS A PREFERENTIAL TRANSFER**
**(AS TO CAMBRIDGE SECURITIES)**

94.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

95.     On or within ninety days prior to the Petition Date, GPMI transferred the Aaserod Pension Payment to and for the benefit of Cambridge Securities, as set forth on Exhibit A, under the heading Aaserod Pension Payment.

96.     The Aaserod Pension Payment was also made for the benefit of Aaserod.

97.     The Aaserod Pension Payment was a transfer of an interest in GPMI's property.

98.     The Aaserod Pension Payment was made while GPMI was insolvent.

99.     Cambridge Securities and/or Aaserod were creditors of GPMI at the time of the Aaserod Pension Payment.

100.     The Aaserod Pension Payment was for or on account of an antecedent debt owed by GPMI to Cambridge Securities and/or Aaserod before the Aaserod Pension Payment was made.

101.     The Aaserod Pension Payment enabled Cambridge Securities and/or Aaserod to receive more than Cambridge Securities and/or Aaserod would have received if: (a) the Bankruptcy Case was a case under chapter 7 of the Bankruptcy Code; (b) the Aaserod Pension Payment had not been made; and (c) Cambridge Securities and/or Aaserod had received payment on the debt to the extent provided by the Bankruptcy Code.

102.     The Aaserod Pension Payment is avoidable as a preferential transfer under 11 U.S.C. § 547.

**COUNT VI**
**(11 U.S.C. § 547)**
**AVOIDANCE OF THE AASEROD PENSION PAYMENT AS A PREFERENTIAL TRANSFER**
**(AS TO AASEROD)**

103.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

104.     On or within ninety days prior to the Petition Date, GPMI transferred the Aaserod Pension Payment to and for the benefit of Cambridge Securities, as set forth on Exhibit A, under the heading Aaserod Pension Payment.

105.     The Aaserod Pension Payment was also made for the benefit of Aaserod.

106.     The Aaserod Pension Payment was a transfer of an interest in GPMI's property.

107.     The Aaserod Pension Payment was made while GPMI was insolvent.

108.     Cambridge Securities and/or Aaserod were creditors of GPMI at the time of the Aaserod Pension Payment.

109.     The Aaserod Pension Payment was for or on account of an antecedent debt owed by GPMI to Cambridge Securities and/or Aaserod before the Aaserod Pension Payment was made.

110.     The Aaserod Pension Payment enabled Cambridge Securities and/or Aaserod to receive more than Cambridge Securities and/or Aaserod would have received if: (a) the Bankruptcy Case was a case under chapter 7 of the Bankruptcy Code; (b) the Aaserod Pension Payment had not been made; and (c) Cambridge Securities and/or Aaserod had received payment on the debt to the extent provided by the Bankruptcy Code.

111.     The Aaserod Pension Payment is avoidable as a preferential transfer under 11 U.S.C. § 547.

**COUNT VII**
**(11 U.S.C. § 550 AND N.Y. DEBT. & CRED. § 278)**
**RECOVERY OF THE AASEROD PENSION PAYMENT AS A FRAUDULENT**
**CONVEYANCE AND A PREFERENTIAL TRANSFER**
**(AS TO CAMBRIDGE SECURITIES AND AASEROD)**

112.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

113.     The Trustee is entitled to avoid the Aaserod Pension Payment pursuant to sections 544, 547, and 548 of the Bankruptcy Code and/or sections 273, 274, and/or 275 of the New York Debtor and Creditor Law.

114.     Cambridge Securities was the initial transferee of the Aaserod Pension Payment and the entity for whose benefit the Aaserod Pension Payment was made.

115.     Aaserod was the immediate or mediate transferee of the Aaserod Pension Payment and the person for whose benefit the Aaserod Pension Payment was made.

116.     Pursuant to section 550(a) of the Bankruptcy Code and/or New York Debtor and Creditor Law § 278, the Trustee is entitled to recover from Cambridge Securities and/or Aaserod the amount of the Aaserod Pension Payment, plus interest to the date of payment and the costs of this action.

## COUNT VIII
## (11 U.S.C. § 548(a)(1)(B))
## AVOIDANCE OF THE KARRO PENSION PAYMENT AS A CONSTRUCTIVE FRAUDULENT TRANSFER
## (AS TO CAMBRIDGE SECURITIES)

117.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

118.     On or within two years prior to the Petition Date, GPMI made the Karro Pension Payment to Cambridge Securities in the aggregate amount of $600,000.00, as set forth on Exhibit A, under the heading Karro Pension Payment.

119.     The Karro Pension Payment was made for the benefit of Karro.

120.     The Karro Pension Payment was a transfer of an interest in GPMI's property.

121.     GPMI received less than reasonably equivalent value in exchange for the Karro Pension Payment.

122.     The Karro Pension Payment was made (a) at a time when GPMI was engaged or was about to engage in a business and transactions for which the remaining assets of GPMI were unreasonably small in relation to the business and transactions, (b) at a time when GPMI intended to incur, or believed or should reasonably have believed that it would incur, debts beyond its ability to pay as they became due, (c) at a time when GPMI was insolvent, or (d) with the result that GPMI became insolvent as a result of the Karro Pension Payment.

123.     At the time of the Karro Pension Payment, Karro was an insider of GPMI, as defined by 11 U.S.C. § 101(31).

124.     The Karro Pension Payment was made under an employment agreement—the Karro Service Agreement—and not in the ordinary course of GPMI's business.

125.    Neither Cambridge Securities nor Karro gave reasonably equivalent value to GPMI in exchange for the Karro Pension Payment and they did not receive the Karro Pension Payment in good faith.

126.    The Karro Pension Payment is avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

**COUNT IX**
**(11 U.S.C. § 548(a)(1)(B))**
**AVOIDANCE OF THE KARRO PENSION PAYMENT AS A CONSTRUCTIVE**
**FRAUDULENT TRANSFER**
**(AS TO KARRO)**

127.    The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

128.    On or within two years prior to the Petition Date, GPMI made the Karro Pension Payment to Cambridge Securities in the aggregate amount of $600,000.00, as set forth on Exhibit A, under the heading Karro Pension Payment.

129.    The Karro Pension Payment was made for the benefit of Karro.

130.    The Karro Pension Payment was a transfer of an interest in GPMI's property.

131.    GPMI received less than reasonably equivalent value in exchange for the Karro Pension Payment.

132.    The Karro Pension Payment was made (a) at a time when GPMI was engaged or was about to engage in a business and transactions for which the remaining assets of GPMI were unreasonably small in relation to the business and transactions, (b) at a time when GPMI intended to incur, or believed or should reasonably have believed that it would incur, debts beyond its ability to pay as they became due, (c) at a time when GPMI was insolvent, or (d) with the result that GPMI became insolvent as a result of the Karro Pension Payment.

133. At the time of the Karro Pension Payment, Karro was an insider of GPMI, as defined by 11 U.S.C. § 101(31).

134. The Karro Pension Payment was made under an employment agreement—the Karro Service Agreement—and not in the ordinary course of GPMI's business.

135. Neither Cambridge Securities nor Karro gave reasonably equivalent value to GPMI in exchange for the Karro Pension Payment and they did not receive the Karro Pension Payment in good faith.

136. The Karro Pension Payment is avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

## COUNT X
### (11 U.S.C. § 544(b) AND N.Y. DEBT. & CRED. §§ 273, 274, 275)
### CONSTRUCTIVE FRAUDULENT CONVEYANCE: KARRO PENSION PAYMENT
### (AS TO CAMBRIDGE SECURITIES)

137. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

138. Section 544(b) of the Bankruptcy Code permits the Trustee to assert claims and causes of action that a creditor could assert under applicable state law. At all relevant times there have been one or more creditors that have held and still hold matured or unmatured unsecured claims against GPMI that were and are allowable under section 502 of the Bankruptcy Code.

139. GPMI made the Karro Pension Payment to and for the benefit of Cambridge Securities.

140. The Karro Pension Payment was also made for the benefit of Karro.

141. Karro was the subsequent transferee of the Karro Pension Payment.

142. The Karro Pension Payment was made on or within six (6) years prior to the date of the Complaint, as reflected on Exhibit A, under the heading Karro Pension Payment.

143. The Karro Pension Payment constituted a conveyance of property of GPMI.

144. The Karro Pension Payment was made (a) at a time when the present fair saleable value of GPMI's assets was substantially less than the amount that would have been required to pay GPMI's probable liability on its debts as they became due and matured, (b) at a time when GPMI was engaged or about to engage in a business or transactions for which the property remaining in GPMI's hands was unreasonably small, (c) at a time when GPMI intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when GPMI was insolvent, and/or (e) with the result that GPMI became insolvent as a result of the Karro Pension Payment.

145. Neither Cambridge Securities nor Karro gave reasonably equivalent value or fair consideration to GPMI in exchange for the Karro Pension Payment and they did not receive the Karro Pension Payment in good faith.

146. The Karro Pension Payment was fraudulent as to GPMI's creditors.

147. The Karro Pension Payment is avoidable as a fraudulent transfer pursuant to section 544 of the Bankruptcy Code and New York Debtor and Creditor Law §§ 273, 274, and/or 275.

## COUNT XI
### (11 U.S.C. § 544(b) AND N.Y. DEBT. & CRED. §§ 273, 274, 275)
### CONSTRUCTIVE FRAUDULENT CONVEYANCE: KARRO PENSION PAYMENT
### (AS TO KARRO)

148. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

149. Section 544(b) of the Bankruptcy Code permits the Trustee to assert claims and causes of action that a creditor could assert under applicable state law. At all relevant times there

have been one or more creditors that have held and still hold matured or unmatured unsecured claims against GPMI that were and are allowable under section 502 of the Bankruptcy Code.

150.    GPMI made the Karro Pension Payment to and for the benefit of Cambridge Securities.

151.    The Karro Pension Payment was also made for the benefit of Karro.

152.    Karro was the subsequent transferee of the Karro Pension Payment.

153.    The Karro Pension Payment was made on or within six (6) years prior to the date of the Complaint, as reflected on Exhibit A, under the heading Karro Pension Payment.

154.    The Karro Pension Payment constituted a conveyance of property of GPMI.

155.    The Karro Pension Payment was made (a) at a time when the present fair saleable value of GPMI's assets was substantially less than the amount that would have been required to pay GPMI's probable liability on its debts as they became due and matured, (b) at a time when GPMI was engaged or about to engage in a business or transactions for which the property remaining in GPMI's hands was unreasonably small, (c) at a time when GPMI intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when GPMI was insolvent, and/or (e) with the result that GPMI became insolvent as a result of the Karro Pension Payment.

156.    Neither Cambridge Securities nor Karro gave reasonably equivalent value or fair consideration to GPMI in exchange for the Karro Pension Payment and they did not receive the Karro Pension Payment in good faith.

157.    The Karro Pension Payment was fraudulent as to GPMI's creditors.

158.     The Karro Pension Payment is avoidable as a fraudulent transfer pursuant to section 544 of the Bankruptcy Code and New York Debtor and Creditor Law §§ 273, 274, and/or 275.

## COUNT XII
### (11 U.S.C. § 547)
### AVOIDANCE OF THE KARRO PENSION PAYMENT AS A PREFERENTIAL TRANSFER
### (AS TO CAMBRIDGE SECURITIES)

159.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

160.     On or within ninety days prior to the Petition Date, GPMI transferred the Karro Pension Payment to and for the benefit of Cambridge Securities, as set forth on Exhibit A, under the heading Karro Pension Payment.

161.     The Karro Pension Payment was also made for the benefit of Karro.

162.     The Karro Pension Payment was a transfer of an interest in GPMI's property.

163.     The Karro Pension Payment was made while GPMI was insolvent.

164.     Cambridge Securities and/or Karro were creditors of GPMI at the time of the Karro Pension Payment.

165.     The Karro Pension Payment was for or on account of an antecedent debt owed by GPMI to Cambridge Securities and/or Karro before the Karro Pension Payment was made.

166.     The Karro Pension Payment enabled Cambridge Securities and/or Karro to receive more than Cambridge Securities and/or Karro would have received if: (a) the Bankruptcy Case was a case under chapter 7 of the Bankruptcy Code; (b) the Karro Pension Payment had not been made; and (c) Cambridge Securities and/or Karro had received payment on the debt to the extent provided by the Bankruptcy Code.

167. The Karro Pension Payment is avoidable as a preferential transfer under 11 U.S.C. § 547.

## COUNT XIII
### (11 U.S.C. § 547)
### AVOIDANCE OF THE KARRO PENSION PAYMENT AS A PREFERENTIAL TRANSFER
### (AS TO KARRO)

168. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

169. On or within ninety days prior to the Petition Date, GPMI transferred the Karro Pension Payment to and for the benefit of Cambridge Securities, as set forth on Exhibit A, under the heading Karro Pension Payment.

170. The Karro Pension Payment was also made for the benefit of Karro.

171. The Karro Pension Payment was a transfer of an interest in GPMI's property.

172. The Karro Pension Payment was made while GPMI was insolvent.

173. Cambridge Securities and/or Karro were creditors of GPMI at the time of the Karro Pension Payment.

174. The Karro Pension Payment was for or on account of an antecedent debt owed by GPMI to Cambridge Securities and/or Karro before the Karro Pension Payment was made.

175. The Karro Pension Payment enabled Cambridge Securities and/or Karro to receive more than Cambridge Securities and/or Karro would have received if: (a) the Bankruptcy Case was a case under chapter 7 of the Bankruptcy Code; (b) the Karro Pension Payment had not been made; and (c) Cambridge Securities and/or Karro had received payment on the debt to the extent provided by the Bankruptcy Code.

176. The Karro Pension Payment is avoidable as a preferential transfer under 11 U.S.C. § 547.

**COUNT XIV**
**(11 U.S.C. § 550 AND N.Y. DEBT. & CRED. § 278)**
**RECOVERY OF THE KARRO PENSION PAYMENT AS A FRAUDULENT**
**CONVEYANCE AND A PREFERENTIAL TRANSFER**
**(AS TO CAMBRIDGE SECURITIES AND KARRO)**

177. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

178. The Trustee is entitled to avoid the Karro Pension Payment pursuant to sections 544, 547, and 548 of the Bankruptcy Code and/or sections 273, 274, and/or 275 of the New York Debtor and Creditor Law.

179. Cambridge Securities was the initial transferee of the Karro Pension Payment and the entity for whose benefit the Karro Pension Payment was made.

180. Karro was the immediate or mediate transferee of the Karro Pension Payment and the person for whose benefit the Karro Pension Payment was made.

181. Pursuant to section 550(a) of the Bankruptcy Code and/or New York Debtor and Creditor Law § 278, the Trustee is entitled to recover from Cambridge Securities and/or Karro the amount of the Karro Pension Payment, plus interest to the date of payment and the costs of this action.

**COUNT XV**
**(11 U.S.C. § 548(a)(1)(B))**
**AVOIDANCE OF THE AASEROD TAX GROSS UP PAYMENTS AS CONSTRUCTIVE FRAUDULENT TRANSFERS**
**(AS TO AASEROD)**

182.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

183.     On or within two (2) years prior to the Petition Date, GPMI made the Aaserod Tax Gross Up Payments to one or more taxing authorities for the benefit of Aaserod in the aggregate amount of $621,350.00, as set forth on Exhibit A, under the heading Aaserod Tax Gross Up Payments.

184.     Each of the Aaserod Tax Gross Up Payments was made for the benefit of Aaserod.

185.     Each of the Aaserod Tax Gross Up Payments was a transfer of an interest in GPMI's property.

186.     Each of the Aaserod Tax Gross Up Payments was made (a) at a time when GPMI was engaged or was about to engage in a business and transactions for which the remaining assets of GPMI were unreasonably small in relation to the business and transactions, (b) at a time when GPMI intended to incur, or believed or should reasonably have believed that it would incur, debts beyond its ability to pay as they became due, (c) at a time when GPMI was insolvent, or (d) with the result that GPMI became insolvent as a result of such Aaserod Tax Gross Up Payment.

187.     At the time of each of the Aaserod Tax Gross Up Payments, Aaserod was an insider of GPMI, as defined by 11 U.S.C. § 101(31).

188.     Each of the Aaserod Tax Gross Up Payments was made under an employment agreement—the Aaserod Service Agreement—and not in the ordinary course of GPMI's business.

189.     GPMI received less than reasonably equivalent value in exchange for each of the Aaserod Tax Gross Up Payments.

190.     Each of the Aaserod Tax Gross Up Payments is avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

**COUNT XVI**
**(11 U.S.C. § 544(b) AND N.Y. DEBT. & CRED. §§ 273, 274, 275)**
**CONSTRUCTIVE FRAUDULENT CONVEYANCE: AASEROD TAX GROSS UP PAYMENTS**
**(AS TO AASEROD)**

191.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

192.     Section 544(b) of the Bankruptcy Code permits the Trustee to assert claims and causes of action that a creditor could assert under applicable state law.  At all relevant times there have been one or more creditors that have held and still hold matured or unmatured unsecured claims against GPMI that were and are allowable under section 502 of the Bankruptcy Code.

193.     The Aaserod Tax Gross Up Payments were made to one or more taxing authorities on or within six (6) years prior to the date of the Complaint, as reflected in Exhibit A, under the heading Aaserod Tax Gross Up Payments.

194.     GPMI made each of the Aaserod Tax Gross Up Payments for the benefit of Aaserod.

195.     Each of the Aaserod Tax Gross Up Payments constituted a conveyance of property of GPMI.

196.     Each of the Aaserod Tax Gross Up Payments was made (a) at a time when the present fair saleable value of GPMI's assets was substantially less than the amount that would have been required to pay GPMI's probable liability on its debts as they became due and matured,

(b) at a time when GPMI was engaged or about to engage in a business or transactions for which the property remaining in GPMI's hands was unreasonably small, (c) at a time when GPMI intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when GPMI was insolvent, and/or (e) with the result that GPMI became insolvent as a result of such Aaserod Tax Gross Up Payment.

197.     GPMI did not receive reasonably equivalent value or fair consideration in exchange for any of the Aaserod Tax Gross Up Payments.

198.     Each of the Aaserod Tax Gross Up Payments was fraudulent as to GPMI's creditors.

199.     Each of the Aaserod Tax Gross Up Payments is avoidable as a fraudulent transfer pursuant to section 544 of the Bankruptcy Code and New York Debtor and Creditor Law §§ 273, 274, and/or 275.

## COUNT XVII
### (11 U.S.C. § 547)
### AVOIDANCE OF THE AASEROD TAX GROSS UP PAYMENTS AS PREFERENTIAL TRANSFERS
### (AS TO AASEROD)

200.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

201.     On or within one year prior to the Petition Date, GPMI transferred the Aaserod Tax Gross Up Payments to one or more taxing authorities, as set forth on Exhibit A, under the heading Aaserod Tax Gross Up Payments.

202.     Each of the Aaserod Tax Gross Up Payments was made for the benefit of Aaserod.

203.     At the time of each of the Aaserod Tax Gross Up Payments, Aaserod was an insider of GPMI, as defined by 11 U.S.C. § 101(31).

204.    Each of the Aaserod Tax Gross Up Payments was a transfer of an interest in GPMI's property.

205.    Each of the Aaserod Tax Gross Up Payments was made while GPMI was insolvent.

206.    Aaserod was a creditor of GPMI at the time of each of the Aaserod Tax Gross Up Payments.

207.    Each of the Aaserod Tax Gross Up Payments was for or on account of an antecedent debt owed by GPMI to Aaserod before such Aaserod Tax Gross Up Payment was made.

208.    Each of the Aaserod Tax Gross Up Payments enabled Aaserod to receive more than Aaserod would have received if: (a) the Bankruptcy Case was a case under Chapter 7 of the Bankruptcy Code; (b) such Aaserod Tax Gross Up Payment had not been made; and (c) Aaserod had received payment on the debt to the extent provided by the Bankruptcy Code.

209.    Each of the Aaserod Tax Gross Up Payments is avoidable as a preferential transfer under 11 U.S.C. § 547.

## COUNT XVIII
### (11 U.S.C. § 550 AND N.Y. DEBT. & CRED. § 278)
### RECOVERY OF THE AASEROD TAX GROSS UP PAYMENTS AS FRAUDULENT CONVEYANCES AND PREFERENTIAL TRANSFERS
### (AS TO AASEROD)

210.    The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

211.    The Trustee is entitled to avoid each of the Aaserod Tax Gross Up Payments pursuant to sections 544, 547, and 548 of the Bankruptcy Code and/or sections 273, 274, and/or 275 of the New York Debtor and Creditor Law.

212.     Aaserod is the entity for whose benefit each of the Aaserod Tax Gross Up Payments was made.

213.     Pursuant to section 550(a) of the Bankruptcy Code and/or New York Debtor and Creditor Law § 278, the Trustee is entitled to recover from Aaserod the amount of the Aaserod Tax Gross Up Payments, plus interest to the date of payment and the costs of this action.

**COUNT XIX**
**(11 U.S.C. § 548(a)(1)(B))**
**AVOIDANCE OF THE KARRO TAX GROSS UP PAYMENTS AS CONSTRUCTIVE FRAUDULENT TRANSFERS**
**(AS TO KARRO)**

214.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

215.     On or within two (2) years prior to the Petition Date, GPMI made the Karro Tax Gross Up Payments to one or more taxing authorities in the aggregate amount of $300,000.00, as set forth on Exhibit A, under the heading Karro Tax Gross Up Payments.

216.     Each of the Karro Tax Gross Up Payments was made for the benefit of Karro.

217.     Each of the Karro Tax Gross Up Payments was a transfer of an interest in GPMI's property.

218.     Each of the Karro Tax Gross Up Payments was made (a) at a time when GPMI was engaged or was about to engage in a business and transactions for which the remaining assets of GPMI were unreasonably small in relation to the business and transactions, (b) at a time when GPMI intended to incur, or believed or should reasonably have believed that it would incur, debts beyond its ability to pay as they became due, (c) at a time when GPMI was insolvent, or (d) with the result that GPMI became insolvent as a result of such Karro Tax Gross Up Payment.

219. At the time of each of the Karro Tax Gross Up Payments, Karro was an insider of GPMI, as defined by 11 U.S.C. § 101(31).

220. Each of the Karro Tax Gross Up Payments was made under an employment agreement—the Karro Service Agreement—and not in the ordinary course of GPMI's business.

221. GPMI received less than reasonably equivalent value in exchange for each of the Karro Tax Gross Up Payments.

222. Each of the Karro Tax Gross Up Payments is avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

## COUNT XX
### (11 U.S.C. § 544(b) AND N.Y. DEBT. & CRED. §§ 273, 274, 275)
### CONSTRUCTIVE FRAUDULENT CONVEYANCE: KARRO TAX GROSS UP PAYMENTS
### (AS TO KARRO)

223. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

224. Section 544(b) of the Bankruptcy Code permits the Trustee to assert claims and causes of action that a creditor could assert under applicable state law. At all relevant times there have been one or more creditors that have held and still hold matured or unmatured unsecured claims against GPMI that were and are allowable under section 502 of the Bankruptcy Code.

225. The Karro Tax Gross Up Payments were made to one or more taxing authorities on or within six (6) years prior to the date of the Complaint, as reflected in Exhibit A, under the heading Karro Tax Gross Up Payments.

226. GPMI made each of the Karro Tax Gross Up Payments for the benefit of Karro.

227. Each of the Karro Tax Gross Up Payments constituted a conveyance of property of GPMI.

228.     Each of the Karro Tax Gross Up Payments was made (a) at a time when the present fair saleable value of GPMI's assets was substantially less than the amount that would have been required to pay GPMI's probable liability on its debts as they became due and matured, (b) at a time when GPMI was engaged or about to engage in a business or transactions for which the property remaining in GPMI's hands was unreasonably small, (c) at a time when GPMI intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when GPMI was insolvent, and/or (e) with the result that GPMI became insolvent as a result of such Karro Tax Gross Up Payment.

229.     GPMI did not receive reasonably equivalent value or fair consideration in exchange for any of the Karro Tax Gross Up Payments.

230.     Each of the Karro Tax Gross Up Payments was fraudulent as to GPMI's creditors.

231.     Each of the Karro Tax Gross Up Payments is avoidable as a fraudulent transfer pursuant to section 544 of the Bankruptcy Code and New York Debtor and Creditor Law §§ 273, 274, and/or 275.

## COUNT XXI
### (11 U.S.C. § 547)
### AVOIDANCE OF THE KARRO TAX GROSS UP PAYMENTS AS PREFERENTIAL TRANSFERS
### (AS TO KARRO)

232.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

233.     On or within one year prior to the Petition Date, GPMI transferred the Karro Tax Gross Up Payments to one or more taxing authorities, as set forth on Exhibit A, under the heading Karro Tax Gross Up Payments.

234.     Each of the Karro Tax Gross Up Payments was made for the benefit of Karro.

235.    At the time of each of the Karro Tax Gross Up Payments, Karro was an insider of GPMI, as defined by 11 U.S.C. § 101(31).

236.    Each of the Karro Tax Gross Up Payments was a transfer of an interest in GPMI's property.

237.    Each of the Karro Tax Gross Up Payments was made while GPMI was insolvent.

238.    Karro was a creditor of GPMI at the time of each of the Karro Tax Gross Up Payments.

239.    Each of the Karro Tax Gross Up Payments was for or on account of an antecedent debt owed by GPMI to Karro before such Karro Tax Gross Up Payments was made.

240.    Each of the Karro Tax Gross Up Payments enabled Karro to receive more than Karro would have received if: (a) the Bankruptcy Case was a case under Chapter 7 of the Bankruptcy Code; (b) such Karro Tax Gross Up Payment had not been made; and (c) Karro had received payment on the debt to the extent provided by the Bankruptcy Code.

241.    Each of the Karro Tax Gross Up Payments is avoidable as a preferential transfer under 11 U.S.C. § 547.

## COUNT XXII
### (11 U.S.C. § 550 AND N.Y. DEBT. & CRED. § 278)
### RECOVERY OF THE KARRO TAX GROSS UP PAYMENTS AS FRAUDULENT CONVEYANCES AND PREFERENTIAL TRANSFERS
### (AS TO KARRO)

242.    The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

243.    The Trustee is entitled to avoid each of the Karro Tax Gross Up Payments pursuant to sections 544, 547, and 548 of the Bankruptcy Code and/or sections 273, 274, and/or 275 of the New York Debtor and Creditor Law.

40

244.     Karro is the entity for whose benefit each of the Karro Tax Gross Up Payments was made.

245.     Pursuant to section 550(a) of the Bankruptcy Code and/or New York Debtor and Creditor Law § 278, the Trustee is entitled to recover from Karro the amount of the Karro Tax Gross Up Payments, plus interest to the date of payment and the costs of this action.

**COUNT XXIII**
**(11 U.S.C. § 548(a)(1)(B))**
**AVOIDANCE OF PROJECT OCTANE PAYMENTS AS CONSTRUCTIVE FRAUDULENT TRANSFERS**
**(AS TO CAMBRIDGE SECURITIES, AASEROD, AND/OR KARRO)**

246.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

247.     On or within two years prior to the Petition Date, GPMI made the Project Octane Payments to Cambridge Securities in the aggregate amount of $991,000.00, as set forth on Exhibit A, under the heading Project Octane Payments.

248.     Each of the Project Octane Payments was made for the benefit of Aaserod.

249.     Each of the Project Octane Payments was also made for the benefit of Karro.

250.     Each of the Project Octane Payments was a transfer of an interest in GPMI's property.

251.     GPMI received less than reasonably equivalent value in exchange for each of the Project Octane Payments.

252.     Each of the Project Octane Payments was made (a) at a time when GPMI was engaged or was about to engage in a business and transactions for which the remaining assets of GPMI were unreasonably small in relation to the business and transactions, (b) at a time when GPMI intended to incur, or believed or should reasonably have believed that it would incur,

debts beyond its ability to pay as they became due, (c) at a time when GPMI was insolvent, or (d) with the result that GPMI became insolvent as a result of such Project Octane Payment.

253.     None of Cambridge Securities, Aaserod, or Karro gave reasonably equivalent value to GPMI in exchange for any of the Project Octane Payments and they did not receive any of the Project Octane Payments in good faith.

254.     Each of the Project Octane Payments is avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

**COUNT XXIV**
**(11 U.S.C. § 544(b) AND N.Y. DEBT. & CRED. §§ 273, 274, 275)**
**CONSTRUCTIVE FRAUDULENT CONVEYANCE: PROJECT OCTANE PAYMENTS**
**(AS TO CAMBRIDGE SECURITIES, AASEROD, AND/OR KARRO)**

255.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

256.     Section 544(b) of the Bankruptcy Code permits the Trustee to assert claims and causes of action that a creditor could assert under applicable state law.  At all relevant times there have been one or more creditors that have held and still hold matured or unmatured unsecured claims against GPMI that were and are allowable under section 502 of the Bankruptcy Code.

257.     GPMI made each of the Project Octane Payments to and for the benefit of Cambridge Securities.

258.     Each of the Project Octane Payments was also made for the benefit of Aaserod.

259.     Each of the Project Octane Payments was also made for the benefit of Karro.

260.     Aaserod and Karro were the subsequent transferees of each of the Project Octane Payments.

261.     Each of the Project Octane Payments was made on or within six (6) years prior to the date of the Complaint, as reflected on Exhibit A, under the heading Project Octane Payments.

262. Each of the Project Octane Payments constituted a conveyance of property of GPMI.

263. Each of the Project Octane Payments was made (a) at a time when the present fair saleable value of GPMI's assets was substantially less than the amount that would have been required to pay GPMI's probable liability on its debts as they became due and matured, (b) at a time when GPMI was engaged or about to engage in a business or transactions for which the property remaining in GPMI's hands was unreasonably small, (c) at a time when GPMI intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when GPMI was insolvent, and/or (e) with the result that GPMI became insolvent as a result of such Project Octane Payment.

264. None of Cambridge Securities, Aaserod, or Karro gave reasonably equivalent value or fair consideration to GPMI in exchange for any of the Project Octane Payments and they did not receive any of the Project Octane Payments in good faith.

265. Each of the Project Octane Payments was fraudulent as to GPMI's creditors.

266. Each of the Project Octane Payments is avoidable as a fraudulent transfer pursuant to section 544 of the Bankruptcy Code and New York Debtor and Creditor Law §§ 273, 274, and/or 275.

**COUNT XXV**
**(11 U.S.C. § 547)**
**AVOIDANCE OF PROJECT OCTANE PAYMENTS AS PREFERENTIAL TRANSFERS**
**(AS TO CAMBRIDGE SECURITIES, AASEROD, AND/OR KARRO)**

267. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

268.     On or within one year prior to the Petition Date, GPMI transferred $91,000 of the Project Octane Payments to and for the benefit of Cambridge Securities, as set forth on Exhibit A, under the heading Project Octane Payments.

269.     On or within ninety days prior to the Petition Date, GPMI transferred $900,000 of the Project Octane Payments to and for the benefit of Cambridge Securities, as set forth on Exhibit A, under the heading Project Octane Payments.

270.     Each of the Project Octane Payments was also made for the benefit of Aaserod.

271.     Each of the Project Octane Payments was also made for the benefit of Karro.

272.     At the time of each of the Project Octane Payments, Aaserod and Karro were both insiders of GPMI, as defined by 11 U.S.C. § 101(31).

273.     Each of the Project Octane Payments was a transfer of an interest in GPMI's property.

274.     Each of the Project Octane Payments was made while GPMI was insolvent.

275.     Cambridge Securities, Aaserod and/or Karro were creditors of GPMI at the time of each of the Project Octane Payments.

276.     Each of the Project Octane Payments was for or on account of an antecedent debt owed by GPMI to Cambridge Securities, Aaserod, and/or Karro before such Project Octane Payment was made.

277.     Each of the Project Octane Payments enabled Cambridge Securities, Aaserod, and/or Karro to receive more than they would have received if: (a) the Bankruptcy Case was a case under chapter 7 of the Bankruptcy Code; (b) such Project Octane Payment had not been made; and (c) Cambridge Securities, Aaserod, and/or Karro had received payment on the debt to the extent provided by the Bankruptcy Code.

278.     Each of the Project Octane Payments is avoidable as a preferential transfer under 11 U.S.C. § 547.

## COUNT XXVI
### (11 U.S.C. § 550 AND N.Y. DEBT. & CRED. § 278)
### RECOVERY OF THE PROJECT OCTANE PAYMENTS AS FRAUDULENT CONVEYANCES AND PREFERENTIAL TRANSFERS
### (AS TO CAMBRIDGE SECURITIES, AASEROD, AND KARRO)

279.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

280.     The Trustee is entitled to avoid the Project Octane Payments pursuant to sections 544, 547, and 548 of the Bankruptcy Code and/or sections 273, 274, and/or 275 of the New York Debtor and Creditor Law.

281.     Cambridge Securities was the initial transferee of each of the Project Octane Payments and the entity for whose benefit each of the Project Octane Payments was made.

282.     Aaserod and Karro were the immediate or mediate transferees of each of the Project Octane Payments and the persons for whose benefit each of the Project Octane Payments was made.

283.     Pursuant to section 550(a) of the Bankruptcy Code and/or New York Debtor and Creditor Law § 278, the Trustee is entitled to recover from Cambridge Securities, Aaserod, and/or Karro the amount of the Project Octane Payments, plus interest to the date of payment and the costs of this action.

## COUNT XXVII
## (11 U.S.C. § 548(a)(1)(B))
## AVOIDANCE OF THE AMEX PAYMENTS AS CONSTRUCTIVE FRAUDULENT TRANSFERS
## (AS TO AASEROD)

284.    The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

285.    On or within two years prior to the Petition Date, GPMI made the AMEX Payments to American Express in the aggregate amount of $67,622.30, as set forth on Exhibit A, under the heading AMEX Payments.

286.    Each of the AMEX Payments was made for the benefit of Aaserod.

287.    Each of the AMEX Payments was a transfer of an interest in GPMI's property.

288.    GPMI received less than reasonably equivalent value in exchange for each of the AMEX Payments.

289.    Each of the AMEX Payments was made (a) at a time when GPMI was engaged or was about to engage in a business and transactions for which the remaining assets of GPMI were unreasonably small in relation to the business and transactions, (b) at a time when GPMI intended to incur, or believed or should reasonably have believed that it would incur, debts beyond its ability to pay as they became due, (c) at a time when GPMI was insolvent, or (d) with the result that GPMI became insolvent as a result of such AMEX Payment.

290.    Aaserod did not give reasonably equivalent value to GPMI in exchange for any of the AMEX Payments.

291.    Each of the AMEX Payments is avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

## COUNT XXVIII
### (11 U.S.C. § 544(b) AND N.Y. DEBT. & CRED. §§ 273, 274, 275)
### CONSTRUCTIVE FRAUDULENT CONVEYANCE: AMEX PAYMENTS
### (AS TO AASEROD)

292.   The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

293.   Section 544(b) of the Bankruptcy Code permits the Trustee to assert claims and causes of action that a creditor could assert under applicable state law.  At all relevant times there have been one or more creditors that have held and still hold matured or unmatured unsecured claims against GPMI that were and are allowable under section 502 of the Bankruptcy Code.

294.   GPMI made each of the AMEX Payments for the benefit of Aaserod.

295.   The AMEX Payments were made on or within six (6) years prior to the date of the Complaint, as reflected on Exhibit A, under the heading AMEX Payments.

296.   Each of the AMEX Payments constituted a conveyance of property of GPMI.

297.   Each of the AMEX Payments was made (a) at a time when the present fair saleable value of GPMI's assets was substantially less than the amount that would have been required to pay GPMI's probable liability on its debts as they became due and matured, (b) at a time when GPMI was engaged or about to engage in a business or transactions for which the property remaining in GPMI's hands was unreasonably small, (c) at a time when GPMI intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when GPMI was insolvent, and/or (e) with the result that GPMI became insolvent as a result of such AMEX Payment.

298.   Aaserod did not give reasonably equivalent value or fair consideration to GPMI in exchange for any of the AMEX Payments.

299.   Each of the AMEX Payments was fraudulent as to GPMI's creditors.

47

300. Each of the AMEX Payments is avoidable as a fraudulent transfer pursuant to section 544 of the Bankruptcy Code and New York Debtor and Creditor Law §§ 273, 274, and/or 275.

## COUNT XXIX
### (11 U.S.C. § 550 AND N.Y. DEBT. & CRED. § 278)
### RECOVERY OF THE AMEX PAYMENTS AS FRAUDULENT CONVEYANCES
### (AS TO AASEROD)

301. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

302. The Trustee is entitled to avoid each of the AMEX Payments pursuant to sections 544 and 548 of the Bankruptcy Code and/or sections 273, 274, and/or 275 of the New York Debtor and Creditor Law.

303. Aaserod was the person for whose benefit each of the AMEX Payments was made.

304. Pursuant to section 550(a) of the Bankruptcy Code and/or New York Debtor and Creditor Law § 278, the Trustee is entitled to recover from Aaserod the amount of the AMEX Payments, plus interest to the date of payment and the costs of this action.

## COUNT XXX
### (N.Y. DEBT. & CRED. §§ 273, 274, 275)
### CONSTRUCTIVE FRAUDULENT CONVEYANCE: HEADQUARTERS AASEROD
### TAX GROSS UP PAYMENT
### (AS TO CAMBRIDGE SECURITIES)

305. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

306. Cambridge Headquarters was indebted to GPMI at the time of the Headquarters Aaserod Tax Gross Up Payment.

307. As of the date of the Complaint, Cambridge Headquarters is indebted to GPMI in the amount of at least $2,108,000.00.

48

308. Cambridge Headquarters made the Headquarters Aaserod Tax Gross Up Payment to and for the benefit of Cambridge Securities.

309. Cambridge Headquarters also made the Headquarters Aaserod Tax Gross Up Payment for the benefit of Aaserod.

310. The Headquarters Aaserod Tax Gross Up Payment totaled $212,550.00.

311. The Headquarters Aaserod Tax Gross Up Payment was made on or within six (6) years of the date of the Complaint, as set forth in Exhibit A, under the heading Headquarters Aaserod Tax Gross Up Payment.

312. The Headquarters Aaserod Tax Gross Up Payment constituted a conveyance of property of Cambridge Headquarters.

313. The Headquarters Aaserod Tax Gross Up Payment was made (a) at a time when the present fair saleable value of Cambridge Headquarters' assets was substantially less than the amount that would have been required to pay Cambridge Headquarters' probable liability on its debts as they became due and matured, (b) at a time when Cambridge Headquarters was engaged or about to engage in a business or transactions for which the property remaining in Cambridge Headquarters' hands was unreasonably small, (c) at a time when Cambridge Headquarters intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when Cambridge Headquarters was insolvent, and/or (e) with the result that Cambridge Headquarters became insolvent as a result of the Headquarters Aaserod Tax Gross Up Payment.

314. The Headquarters Aaserod Tax Gross Up Payment was made without Cambridge Headquarters receiving fair consideration or reasonably equivalent value, and neither Cambridge Securities nor Aaserod received the Headquarters Aaserod Tax Gross Up Payment in good faith.

315.     The Headquarters Aaserod Tax Gross Up Payment was fraudulent as to GPMI's creditors.

316.     The Headquarters Aaserod Tax Gross Up Payment is avoidable as a fraudulent transfer pursuant to New York Debtor and Creditor Law §§ 273, 274, and/or 275.

<u>**COUNT XXXI**</u>
**(N.Y. DEBT. & CRED. §§ 273, 274, 275)**
**CONSTRUCTIVE FRAUDULENT CONVEYANCE: HEADQUARTERS AASEROD TAX GROSS UP PAYMENT**
**(AS TO AASEROD)**

317.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

318.     Cambridge Headquarters was indebted to GPMI at the time of the Headquarters Aaserod Tax Gross Up Payment.

319.     As of the date of the Complaint, Cambridge Headquarters is indebted to GPMI in the amount of at least $2,108,000.00.

320.     Cambridge Headquarters made the Headquarters Aaserod Tax Gross Up Payment for the benefit of Aaserod.

321.     The Headquarters Aaserod Tax Gross Up Payment totaled $212,550.00.

322.     The Headquarters Aaserod Tax Gross Up Payment was made on or within six (6) years of the date of the Complaint, as set forth in Exhibit A, under the heading Headquarters Aaserod Tax Gross Up Payment.

323.     The Headquarters Aaserod Tax Gross Up Payment constituted a conveyance of property of Cambridge Headquarters.

324.     The Headquarters Aaserod Tax Gross Up Payment was made (a) at a time when the present fair saleable value of Cambridge Headquarters' assets was substantially less than the

amount that would have been required to pay Cambridge Headquarters' probable liability on its debts as they became due and matured, (b) at a time when Cambridge Headquarters was engaged or about to engage in a business or transactions for which the property remaining in Cambridge Headquarters' hands was unreasonably small, (c) at a time when Cambridge Headquarters intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when Cambridge Headquarters was insolvent, and/or (e) with the result that Cambridge Headquarters became insolvent as a result of the Headquarters Aaserod Tax Gross Up Payment.

325. The Headquarters Aaserod Tax Gross Up Payment was made without Cambridge Headquarters receiving fair consideration or reasonably equivalent value, and neither Cambridge Securities nor Aaserod received the Headquarters Aaserod Tax Gross Up Payment in good faith.

326. The Headquarters Aaserod Tax Gross Up Payment was fraudulent as to GPMI's creditors.

327. The Headquarters Aaserod Tax Gross Up Payment is avoidable as a fraudulent transfer pursuant to New York Debtor and Creditor Law §§ 273, 274, and/or 275.

**COUNT XXXII**
**(N.Y. DEBT. & CRED. § 278)**
**RECOVERY OF THE HEADQUARTERS AASEROD TAX GROSS UP PAYMENT AS A FRAUDULENT CONVEYANCE**
**(AS TO CAMBRIDGE SECURITIES AND AASEROD)**

328. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

329. The Trustee is entitled to avoid the Headquarters Aaserod Tax Gross Up Payment pursuant to sections 273, 274, and/or 275 of the New York Debtor and Creditor Law.

330. Cambridge Securities was the initial transferee of the Headquarters Aaserod Tax Gross Up Payment.

331.     Aaserod was the beneficiary and/or the mediate or the mediate or immediate transferee of the Headquarters Aaserod Tax Gross Up Payment.

332.     Pursuant to New York Debtor and Creditor Law § 278, the Trustee is entitled to recover from Cambridge Securities and Aaserod the amount of the Headquarters Aaserod Tax Gross Up Payment, plus interest to the date of payment and the costs of this action.

## COUNT XXXIII
### (N.Y. DEBT. & CRED. §§ 273, 274, 275)
### CONSTRUCTIVE FRAUDULENT CONVEYANCE: HEADQUARTERS KARRO TAX GROSS UP PAYMENT
### (AS TO KARRO)

333.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

334.     Cambridge Headquarters was indebted to GPMI at the time of the Headquarters Karro Tax Gross Up Payment.

335.     As of the date of the Complaint, Cambridge Headquarters is indebted to GPMI in the amount of at least $2,108,000.00.

336.     Cambridge Headquarters made the Headquarters Karro Tax Gross Up Payment to and for the benefit of Karro.

337.     The Headquarters Karro Tax Gross Up Payment totaled $116,950.00.

338.     The Headquarters Karro Tax Gross Up Payment was made on or within six (6) years of the date of the Complaint, as set forth in Exhibit A, under the heading Headquarters Karro Tax Gross Up Payment.

339.     The Headquarters Karro Tax Gross Up Payment constituted a conveyance of property of Cambridge Headquarters.

340. The Headquarters Karro Tax Gross Up Payment was made (a) at a time when the present fair saleable value of Cambridge Headquarters' assets was substantially less than the amount that would have been required to pay Cambridge Headquarters' probable liability on its debts as they became due and matured, (b) at a time when Cambridge Headquarters was engaged or about to engage in a business or transactions for which the property remaining in Cambridge Headquarters' hands was unreasonably small, (c) at a time when Cambridge Headquarters intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when Cambridge Headquarters was insolvent, and/or (e) with the result that Cambridge Headquarters became insolvent as a result of the Headquarters Karro Tax Gross Up Payment.

341. The Headquarters Karro Tax Gross Up Payment was made without Cambridge Headquarters receiving fair consideration or reasonably equivalent value, and Karro did not receive the Headquarters Karro Tax Gross Up Payment in good faith.

342. The Headquarters Karro Tax Gross Up Payment was fraudulent as to GPMI's creditors.

343. The Headquarters Karro Tax Gross Up Payment is avoidable as a fraudulent transfer pursuant to New York Debtor and Creditor Law §§ 273, 274, and/or 275.

**COUNT XXXIV**
**(N.Y. DEBT. & CRED. § 278)**
**RECOVERY OF THE HEADQUARTERS KARRO TAX GROSS UP PAYMENT AS A**
**FRAUDULENT CONVEYANCE**
**(AS TO KARRO)**

344. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

345. The Trustee is entitled to avoid the Headquarters Karro Tax Gross Up Payment pursuant to sections 273, 274, and/or 275 of the New York Debtor and Creditor Law.

346. Karro was the initial transferee of the Headquarters Karro Tax Gross Up Payment, and the beneficiary of the Headquarters Karro Tax Gross Up Payment.

347. Pursuant to New York Debtor and Creditor Law § 278, the Trustee is entitled to recover from Karro the amount of the Headquarters Karro Tax Gross Up Payment, plus interest to the date of payment and the costs of this action.

**COUNT XXXV**
**(N.Y. DEBT. & CRED. §§ 273, 274, 275)**
**CONSTRUCTIVE FRAUDULENT CONVEYANCE: HEADQUARTERS KARRO PENSION PAYMENT**
**(AS TO KARRO)**

348. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

349. Cambridge Headquarters was indebted to GPMI at the time of the Headquarters Karro Pension Payment.

350. As of the date of the Complaint, Cambridge Headquarters is indebted to GPMI in the amount of at least $2,108,000.00.

351. Cambridge Headquarters made the Headquarters Karro Pension Payment to and for the benefit of Karro.

352. The Headquarters Karro Pension Payment totaled $236,000.00.

353. The Headquarters Karro Pension Payment was made on or within six (6) years of the date of the Complaint, as set forth in Exhibit A, under the heading Headquarters Karro Pension Payment.

354. The Headquarters Karro Pension Payment constituted a conveyance of property of Cambridge Headquarters.

355.     The Headquarters Karro Pension Payment was made (a) at a time when the present fair saleable value of Cambridge Headquarters' assets was substantially less than the amount that would have been required to pay Cambridge Headquarters' probable liability on its debts as they became due and matured, (b) at a time when Cambridge Headquarters was engaged or about to engage in a business or transactions for which the property remaining in Cambridge Headquarters' hands was unreasonably small, (c) at a time when Cambridge Headquarters intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when Cambridge Headquarters was insolvent, and/or (e) with the result that Cambridge Headquarters became insolvent as a result of the Headquarters Karro Pension Payment.

356.     Karro did not give fair consideration or reasonably equivalent value to Cambridge Headquarters in exchange for the Headquarters Karro Pension Payment and did not receive the Headquarters Karro Pension Payment in good faith.

357.     The Headquarters Karro Pension Payment was fraudulent as to GPMI's creditors.

358.     The Headquarters Karro Pension Payment is avoidable as a fraudulent transfer pursuant to New York Debtor and Creditor Law §§ 273, 274, and/or 275.

**COUNT XXXVI**
**(N.Y. DEBT. & CRED. § 278)**
**RECOVERY OF THE HEADQUARTERS KARRO PENSION PAYMENT AS A**
**FRAUDULENT CONVEYANCE**
**(AS TO KARRO)**

359.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

360.     The Trustee is entitled to avoid the Headquarters Karro Pension Payment pursuant to sections 273, 274, and/or 275 of the New York Debtor and Creditor Law.

361.     Karro was the initial transferee of the Headquarters Karro Pension Payment.

362. Karro was the beneficiary of the Headquarters Karro Pension Payment.

363. Pursuant to New York Debtor and Creditor Law § 278, the Trustee is entitled to recover from Karro the amount of the Headquarters Karro Pension Payment, plus interest to the date of payment and the costs of this action.

## COUNT XXXVII
### (N.Y. DEBT. & CRED. §§ 273, 274, 275)
### CONSTRUCTIVE FRAUDULENT CONVEYANCE: ADDITIONAL HEADQUARTERS PENSION PAYMENTS
### (AS TO CAMBRIDGE SECURITIES, AASEROD, AND KARRO)

364. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

365. Cambridge Headquarters was indebted to GPMI at the time of each of the Additional Headquarters Pension Payments.

366. As of the date of the Complaint, Cambridge Headquarters is indebted to GPMI in the amount of at least $2,108,000.00.

367. Cambridge Headquarters made each of the Additional Headquarters Pension Payments to and for the benefit of Cambridge Securities.

368. Each of the Additional Headquarters Pension Payments was also made for the benefit of Aaserod.

369. Each of the Additional Headquarters Pension Payments was also made for the benefit of Karro.

370. The Additional Headquarters Pension Payment totaled $397,000.00.

371. The Additional Headquarters Pension Payments were made on or within six (6) years of the date of the Complaint, as set forth in Exhibit A, under the heading Additional Headquarters Pension Payments.

372.     Each of the Additional Headquarters Pension Payments constituted a conveyance of property of Cambridge Headquarters.

373.     Each of the Additional Headquarters Pension Payments was made (a) at a time when the present fair saleable value of Cambridge Headquarters' assets was substantially less than the amount that would have been required to pay Cambridge Headquarters' probable liability on its debts as they became due and matured, (b) at a time when Cambridge Headquarters was engaged or about to engage in a business or transactions for which the property remaining in Cambridge Headquarters' hands was unreasonably small, (c) at a time when Cambridge Headquarters intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when Cambridge Headquarters was insolvent, and/or (e) with the result that Cambridge Headquarters became insolvent as a result of such Additional Headquarters Pension Payment.

374.     None of Cambridge Securities, Aaserod, or Karro gave fair consideration or reasonably equivalent value to Cambridge Headquarters in exchange for any of the Additional Headquarters Pension Payments and they did not receive any of the Additional Headquarters Pension Payments in good faith.

375.     Each of the Additional Headquarters Pension Payments was fraudulent as to GPMI's creditors.

376.     Each of the Additional Headquarters Pension Payments is avoidable as a fraudulent transfer pursuant to New York Debtor and Creditor Law §§ 273, 274, and/or 275.

**COUNT XXXVIII**
**(N.Y. DEBT. & CRED. § 278)**
**RECOVERY OF THE ADDITIONAL HEADQUARTERS PENSION PAYMENTS AS
FRAUDULENT CONVEYANCES
(AS TO CAMBRIDGE SECURITIES, AASEROD AND KARRO)**

377.    The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

378.    The Trustee is entitled to avoid each of the Additional Headquarters Pension Payments pursuant to sections 273, 274, and/or 275 of the New York Debtor and Creditor Law.

379.    Cambridge Securities was the initial transferee of each of the Additional Headquarters Pension Payments.

380.    Aaserod and/or Karro were the beneficiaries of each of the Additional Headquarters Pension Payments.

381.    Aaserod and/or Karro were the mediate or immediate transferees of each of the Additional Headquarters Pension Payments.

382.    Pursuant to New York Debtor and Creditor Law § 278, the Trustee is entitled to recover from Cambridge Securities, Aaserod, and/or Karro the amount of the Additional Headquarters Pension Payments, plus interest to the date of payment and the costs of this action.

**COUNT XXXIX**
**(N.Y. DEBT. & CRED. §§ 273, 274, 275)**
**CONSTRUCTIVE FRAUDULENT CONVEYANCE:
HEADQUARTERS SECURITIES  PAYMENTS
(AS TO CAMBRIDGE SECURITIES, AASEROD, AND KARRO)**

383.    The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

384.    Cambridge Headquarters was indebted to GPMI at the time of each of the Headquarters Securities Payments.

385.     As of the date of the Complaint, Cambridge Headquarters is indebted to GPMI in the amount of at least $2,108,000.00.

386.     Cambridge Headquarters made each of the Headquarters Securities Payments to and for the benefit of Cambridge Securities.

387.     Each of the Headquarters Securities Payments was also made for the benefit of Aaserod.

388.     Each of the Headquarters Securities Payments was also made for the benefit of Karro.

389.     Aaserod and/or Karro were the mediate or immediate transferees of each of the Headquarters Securities Payments.

390.     The Headquarters Securities Payments totaled $1,250,000.00.

391.     The Headquarters Securities Payments were made on or within six (6) years of the date of the Complaint, as set forth in Exhibit A, under the heading Headquarters Securities Payments.

392.     Each of the Headquarters Securities Payments constituted a conveyance of property of Cambridge Headquarters.

393.     Each of the Headquarters Securities Payments was made (a) at a time when the present fair saleable value of Cambridge Headquarters' assets was substantially less than the amount that would have been required to pay Cambridge Headquarters' probable liability on its debts as they became due and matured, (b) at a time when Cambridge Headquarters was engaged or about to engage in a business or transactions for which the property remaining in Cambridge Headquarters' hands was unreasonably small, (c) at a time when Cambridge Headquarters intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a

time when Cambridge Headquarters was insolvent, and/or (e) with the result that Cambridge Headquarters became insolvent as a result of such Headquarters Securities Payment.

394. None of Cambridge Securities, Aaserod, or Karro gave fair consideration or reasonably equivalent value to Cambridge Headquarters in exchange for any of the Headquarters Securities Payments and did not receive any of the Headquarters Securities Payments in good faith.

395. Each of the Headquarters Securities Payments was fraudulent as to GPMI's creditors.

396. Each of the Headquarters Securities Payments is avoidable as a fraudulent transfer pursuant to New York Debtor and Creditor Law §§ 273, 274, and/or 275.

**COUNT XL**
**(N.Y. DEBT. & CRED. § 278)**
**RECOVERY OF THE HEADQUARTERS SECURITIES PAYMENTS AS**
**FRAUDULENT CONVEYANCES**
**(AS TO CAMBRIDGE SECURITIES, AASEROD, AND KARRO)**

397. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

398. The Trustee is entitled to avoid each of the Headquarters Securities Payments pursuant to sections 273, 274, and/or 275 of the New York Debtor and Creditor Law.

399. Cambridge Securities was the initial transferee of each of the Headquarters Securities Payments.

400. Aaserod and/or Karro were the beneficiaries of each of the Headquarters Securities Payments and/or the mediate or immediate transferees of each of the Headquarters Securities Payments.

401.    Pursuant to New York Debtor and Creditor Law § 278, the Trustee is entitled to recover from Cambridge Securities, Aaserod, and/or Karro the amount of the Headquarters Securities Payments, plus interest to the date of payment and the costs of this action.

**COUNT XLI**
**(N.Y. DEBT. & CRED. §§ 273, 274, 275)**
**CONSTRUCTIVE FRAUDULENT CONVEYANCE: EISENBERG PAYMENT**
**(AS TO EISENBERG, CAMBRIDGE SECURITIES, AASEROD, AND KARRO)**

402.    The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

403.    Cambridge Headquarters was indebted to GPMI at the time of the Eisenberg Payment.

404.    As of the date of the Complaint, Cambridge Headquarters is indebted to GPMI in the amount of at least $2,108,000.00.

405.    Cambridge Headquarters made the Eisenberg Payment to Eisenberg.

406.    The Eisenberg Payment was made for the benefit of Cambridge Securities.

407.    The Eisenberg Payment was also made for the benefit of Aaserod.

408.    The Eisenberg Payment was also made for the benefit of Karro.

409.    The Eisenberg Payment totaled $350,000.00.

410.    The Eisenberg Payment was made on or within six (6) years of the date of the Complaint, as set forth in Exhibit A, under the heading Eisenberg Payment.

411.    The Eisenberg Payment constituted a conveyance of property of Cambridge Headquarters.

412.    The Eisenberg was made (a) at a time when the present fair saleable value of Cambridge Headquarters' assets was substantially less than the amount that would have been required to pay Cambridge Headquarters' probable liability on its debts as they became due and

matured, (b) at a time when Cambridge Headquarters was engaged or about to engage in a business or transactions for which the property remaining in Cambridge Headquarters' hands was unreasonably small, (c) at a time when Cambridge Headquarters intended to or believed it would incur debts beyond its ability to pay as they matured, (d) at a time when Cambridge Headquarters was insolvent, and/or (e) with the result that Cambridge Headquarters became insolvent as a result of the Eisenberg Payment.

413. None of Eisenberg, Cambridge Securities, Aaserod, or Karro gave fair consideration or reasonably equivalent value to Cambridge Headquarters in exchange for the Eisenberg Payment and they did not receive the Eisenberg Payment in good faith.

414. The Eisenberg Payment was fraudulent as to GPMI's creditors.

415. The Eisenberg Payment is avoidable as a fraudulent transfer pursuant to New York Debtor and Creditor Law §§ 273, 274, and/or 275.

## COUNT XLII
### (N.Y. DEBT. & CRED. § 278)
### RECOVERY OF THE EISENBERG PAYMENT AS A FRAUDULENT CONVEYANCE
### (AS TO EISENBERG, CAMBRIDGE SECURITIES, AASEROD AND KARRO)

416. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

417. The Trustee is entitled to avoid the Eisenberg Payment pursuant to sections 273, 274, and/or 275 of the New York Debtor and Creditor Law.

418. Eisenberg was the initial transferee of the Eisenberg Payment.

419. Cambridge Securities, Aaserod and/or Karro were the beneficiaries of the Eisenberg Payment.

420. Pursuant to New York Debtor and Creditor Law § 278, the Trustee is entitled to recover from Eisenberg, Cambridge Securities, Aaserod and/or Karro the amount of the Eisenberg Payment, plus interest to the date of payment and the costs of this action.

## COUNT XLIII
## (11 U.S.C. § 549)
## AVOIDANCE OF POST-PETITION KARRO PENSION PAYMENT
## (AS TO KARRO)

421. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

422. After the Petition Date, GPMI transferred to Karro, on account of obligations that arose before the Petition Date, $69,085.00, as set forth on Exhibit A, under the heading Post-Petition Karro Pension Payment.

423. The Post-Petition Karro Pension Payment was not made in the ordinary course of business between GPMI and Karro, was not authorized, and thus is avoidable under 11 U.S.C. § 549.

## COUNT XLIV
## (11 U.S.C. § 550)
## RECOVERY OF POST-PETITION KARRO PENSION PAYMENT
## (AS TO KARRO)

424. The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

425. The Trustee is entitled to avoid the Post-Petition Karro Pension Payment pursuant to section 549 of the Bankruptcy Code.

426. Karro was the initial transferee of the Post-Petition Karro Pension Payment and the person for whose benefit the Post-Petition Karro Pension Payment was made.

427.     Pursuant to section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover from Karro the amount of the Post-Petition Karro Pension Payment, plus interest to the date of payment and the costs of this action.

**COUNT XLV**
**(11 U.S.C. § 549)**
**AVOIDANCE OF POST-PETITION AASEROD PENSION PAYMENT**
**(AS TO CAMBRIDGE SECURITIES)**

428.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

429.     After the Petition, Date GPMI transferred to Cambridge Securities, on account of obligations that arose before the Petition Date, $121,627.00, as set forth on Exhibit A, under the heading Post-Petition Aaserod Pension Payment.

430.     The Post-Petition Aaserod Pension Payment was not made in the ordinary course of business between GPMI and Cambridge Securities, was not authorized, and thus is avoidable under 11 U.S.C. § 549.

**COUNT XLVI**
**(11 U.S.C. § 550)**
**RECOVERY OF POST-PETITION AASEROD PENSION PAYMENT**
**(AS TO CAMBRIDGE SECURITIES AND AASEROD)**

431.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

432.     The Trustee is entitled to avoid the Post-Petition Aaserod Pension Payment pursuant to section 549 of the Bankruptcy Code.

433.     Cambridge Securities was the initial transferee of the Post-Petition Aaserod Pension Payment and the entity for whose benefit the Post-Petition Aaserod Pension Payment was made.

434.     Aaserod was the mediate or immediate transferee of the Post-Petition Aaserod Pension Payment and the person for whose benefit the Post-Petition Aaserod Pension Payment was made.

435.     Pursuant to section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover from Cambridge Securities and/or Aaserod the amount of the Post-Petition Aaserod Pension Payment, plus interest to the date of payment and the costs of this action.

### COUNT XLVII
**(11 U.S.C. § 502)**
**DISALLOWANCE OF AASEROD'S CLAIMS**

436.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

437.     Aaserod is person from whom property is recoverable under 11 U.S.C. § 550.

438.     Aaserod is a subsequent transferee and/or beneficiary of the Aaserod Pension Payment, the Aaserod Tax Gross Up Payments, the Project Octane Payments, the AMEX Payments, and the Post-Petition Aaserod Pension Payment.

439.     The Aaserod Pension Payment, the Aaserod Tax Gross Up Payments, the Project Octane Payments, the AMEX Payments, and the Post-Petition Aaserod Pension Payment are avoidable under sections 544, 547, 548, and/or 549 of the Bankruptcy Code.

440.     Pursuant to 11 U.S.C. § 502(d), any and all claims of Aaserod and/or his assignee against GPMI, its estate, or the Trustee, including the Aaserod Claims, must be disallowed until such time as Aaserod pays to the Trustee an amount equal to the aggregate amount of the Aaserod Pension Payment, the Aaserod Tax Gross Up Payments, the Project Octane Payments, the AMEX Payments, and the Post-Petition Aaserod Pension Payment, plus interest thereon and costs.

65

441.     Pursuant to 11 U.S.C. § 502(j), any and all claims of Aaserod, and/or his assignee, against GPMI, its estate, or the Trustee, previously allowed by GPMI or the Trustee, must be reconsidered and disallowed until such time as Aaserod pays to the Trustee an amount equal to the aggregate amount of the Aaserod Pension Payment, the Aaserod Tax Gross Up Payments, the Project Octane Payments, the AMEX Payments, and the Post-Petition Aaserod Pension Payment, plus interest thereon and costs.

### COUNT XLVIII
### (11 U.S.C. § 502)
### DISALLOWANCE OF KARRO'S CLAIMS

442.     The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

443.     Karro is a person from whom property is recoverable under 11 U.S.C. § 550.

444.     Karro is an initial transferee, subsequent transferee, and/or beneficiary of the Karro Pension Payment, the Karro Tax Gross Up Payments, the Project Octane Payments, and the Post-Petition Karro Pension Payment.

445.     The Karro Pension Payment, the Karro Tax Gross Up Payments, the Project Octane Payments, and the Post-Petition Karro Pension Payment are avoidable under sections 544, 547, 548, and/or 549 of the Bankruptcy Code.

446.     Pursuant to 11 U.S.C. § 502(d), any and all claims of Karro and/or his assignee against GPMI, its estate, or the Trustee, including the Karro Claims, must be disallowed until such time as Karro pays to the Trustee an amount equal to the aggregate amount of the Karro Pension Payment, the Karro Tax Gross Up Payments, the Project Octane Payments, and the Post-Petition Karro Pension Payment, plus interest thereon and costs.

447.    Pursuant to 11 U.S.C. § 502(j), any and all claims of Karro, and/or his assignee, against GPMI, its estate, or the Trustee, previously allowed by GPMI or the Trustee, must be reconsidered and disallowed until such time as Karro pays to the Trustee an amount equal to the aggregate amount of the Karro Pension Payment, the Karro Tax Gross Up Payments, the Project Octane Payments, and the Post-Petition Karro Pension Payment, plus interest thereon and costs.

### COUNT XLIX
### (11 U.S.C. § 502)
### DISALLOWANCE OF
### CAMBRIDGE SECURITIES' CLAIMS

448.    The Trustee repeats and reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

449.    Cambridge Securities is an entity from which property is recoverable under 11 U.S.C. § 550.

450.    Cambridge Securities is an initial transferee and/or beneficiary of the Aaserod Pension Payment, the Karro Pension Payment, the Project Octane Payments, and the Post-Petition Aaserod Pension Payment.

451.    The Aaserod Pension Payment, the Karro Pension Payment, the Project Octane Payments, and the Post-Petition Aaserod Pension Payment are avoidable under Sections 544, 547, 548, and/or 549 of the Bankruptcy Code.

452.    Pursuant to 11 U.S.C. § 502(d), any and all claims of Cambridge Securities and/or its assignee against GPMI, its estate, or the Trustee must be disallowed until such time as Cambridge Securities pays to the Trustee an amount equal to the aggregate amount of the Aaserod Pension Payment, the Karro Pension Payment, the Project Octane Payments, and the Post-Petition Aaserod Pension Payment, plus interest thereon and costs.

453. Pursuant to 11 U.S.C. § 502(j), any and all claims of Cambridge Securities, and/or its assignee, against GPMI, its estate, or the Trustee, previously allowed by GPMI or the Trustee, must be reconsidered and disallowed until such time as Cambridge Securities pays to the Trustee an amount equal to the aggregate amount of the Aaserod Pension Payment, the Karro Pension Payment, the Project Octane Payments, and the Post-Petition Aaserod Pension Payment, plus interest thereon and costs.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee requests that this Court grant it the following relief against the Defendants:

As to all relevant Counts, that the Court enter judgment against Aaserod:

A. That the Aaserod Pension Payment, the Aaserod Tax Gross Up Payments, the Project Octane Payments, the AMEX Payments, and the Post-Petition Aaserod Pension Payment, avoidable under 11 U.S.C. §§ 544, 547, 548, and/or 549, as well as applicable nonbankruptcy law, in the total aggregate amount of not less than $3,001,599.30, be avoided;

B. That the Aaserod Pension Payment, the Aaserod Tax Gross Up Payments, the Project Octane Payments, the AMEX Payments, and the Post-Petition Aaserod Pension Payment, to the extent they are avoided pursuant to 11 U.S.C. §§ 544, 547, 548, and/or 549, as well as applicable nonbankruptcy law, be recovered by the Trustee pursuant to 11 U.S.C. § 550 and/or NYDCL § 278;

C. That the Additional Headquarters Pension Payments, the Headquarters Aaserod Tax Gross Up Payment, the Headquarters Securities Payments, and the Eisenberg Payment, avoidable under NYDCL §§ 273, 274, and/or 275, in the total aggregate

68

amount of not less than $2,209,550.00, be avoided to the extent permitted by the NYDCL;

D.    That the Additional Headquarters Pension Payments, the Headquarters Aaserod Tax Gross Up Payment, the Headquarters Securities Payments, and the Eisenberg Payment, to the extent they are avoided pursuant to NYDCL §§ 273, 274, and/or 275, be recovered by the Trustee pursuant to, and to the extent permitted by NYDCL § 278;

E.    Disallowing, in accordance with 11 U.S.C. § 502(d), any claims held by Aaserod and/or his assignee, including the Aaserod Claims, until Aaserod satisfies the judgment in respect of the Aaserod Pension Payment, the Aaserod Tax Gross Up Payments, the Project Octane Payments, the AMEX Payments, and the Post-Petition Aaserod Pension Payment;

F.    Disallowing, in accordance with 11 U.S.C. § 502(j), any claims held by Aaserod and/or his assignee, including the Aaserod Claims, until Aaserod satisfies the judgment in respect of the Aaserod Pension Payment, the Aaserod Tax Gross Up Payments, the Project Octane Payments, the AMEX Payments, and the Post-Petition Aaserod Pension Payment;

G.    Awarding pre-judgment interest at the maximum legal rate running from the date of the Aaserod Pension Payment, the Aaserod Tax Gross Up Payments, the Project Octane Payments, the AMEX Payments, the Post-Petition Aaserod Pension Payment, the Additional Headquarters Pension Payments, the Headquarters Aaserod Tax Gross Up Payment, the Headquarters Securities Payments, and the Eisenberg Payment, to the date of judgment herein;

H.     Awarding post judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

I.     Requiring Aaserod to pay forthwith the judgment amount awarded in favor of the Trustee;

J.     Granting the Trustee such other and further relief as the Court deems just and proper.

As to all relevant Counts, that the Court enter judgment against Karro:

K.     That the Karro Pension Payment, the Karro Tax Gross Up Payments, the Project Octane Payments, and the Post-Petition Karro Pension Payment, avoidable under 11 U.S.C. §§ 544, 547, 548, and/or 549, as well as applicable nonbankruptcy law, in the total aggregate amount of not less than $1,960,085.00, be avoided;

L.     That the Karro Pension Payment, the Karro Tax Gross Up Payments, the Project Octane Payments, and the Post-Petition Karro Pension Payment, to the extent they are avoided pursuant to 11 U.S.C. §§ 544, 547, 548, and/or 549, as well as applicable nonbankruptcy law, be recovered by the Trustee pursuant to 11 U.S.C. § 550 and/or NYDCL § 278;

M.     That the Headquarters Karro Pension Payment, the Additional Headquarters Pension Payments, the Headquarters Karro Tax Gross Up Payment, the Headquarters Securities Payments, and the Eisenberg Payment, avoidable under NYDCL §§ 273, 274, and/or 275, in the total aggregate amount of not less than $2,349,950.00, be avoided to the extent permitted by the NYDCL;

N.     That the Headquarters Karro Pension Payment, the Additional Headquarters Pension Payments, the Headquarters Karro Tax Gross Up Payment, the Headquarters Securities Payments, and the Eisenberg Payment, to the extent they are avoided

pursuant to NYDCL §§ 273, 274, and/or 275, be recovered by the Trustee pursuant to, and to the extent permitted by, NYDCL § 278;

O.     Disallowing, in accordance with 11 U.S.C. § 502(d), any claims held by Karro and/or his assignee, including the Karro Claims, until Karro satisfies the judgment in respect of the Karro Pension Payment, the Karro Tax Gross Up Payments, the Project Octane Payments, and the Post-Petition Karro Pension Payment;

P.     Disallowing, in accordance with 11 U.S.C. § 502(j), any claims held by Karro and/or his assignee, including the Karro Claims, until Karro satisfies the judgment in respect of the Karro Pension Payment, the Karro Tax Gross Up Payments, the Project Octane Payments, and the Post-Petition Karro Pension Payment;

Q.     Awarding pre-judgment interest at the maximum legal rate running from the date of the Karro Pension Payment, the Karro Tax Gross Up Payments, the Project Octane Payments, the Post-Petition Karro Pension Payment, Headquarters Karro Pension Payment, the Additional Headquarters Pension Payments, the Headquarters Karro Tax Gross Up Payment, the Headquarters Securities Payments, and the Eisenberg Payment, to the date of judgment herein;

R.     Awarding post judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

S.     Requiring Karro to pay forthwith the judgment amount awarded in favor of the Trustee;

T.     Granting the Trustee such other and further relief as the Court deems just and proper.

As to all relevant Counts, that the Court enter judgment against Cambridge Securities:

U.      That the Aaserod Pension Payment, the Karro Pension Payment, and the Project Octane Payments, and the Post-Petition Aaserod Pension Payment, avoidable under 11 U.S.C. §§ 544, 547, 548, and/or 549, as well as applicable nonbankruptcy law, in the total aggregate amount of not less than $2,912,627.00, be avoided;

V.      That the Aaserod Pension Payment, the Karro Pension Payment, the Project Octane Payments, and the Post-Petition Aaserod Pension Payment, to the extent they are avoided pursuant to 11 U.S.C. §§ 544, 547, 548, and/or 549, as well as applicable nonbankruptcy law, be recovered by the Trustee pursuant to 11 U.S.C. § 550 and/or NYDCL §278;

W.      That the Additional Headquarters Pension Payments, the Headquarters Aaserod Tax Gross Up Payment, the Headquarters Securities Payments, and the Eisenberg Payment, avoidable under NYDCL §§ 273, 274, and/or 275, in the total aggregate amount of not less than $2,209,550, be avoided to the extent permitted by the NYDCL;

X.      That the Additional Headquarters Pension Payments, the Headquarters Aaserod Tax Gross Up Payment, the Headquarters Securities Payments, and the Eisenberg Payment, to the extent they are avoided pursuant to NYDCL §§ 273, 274, and/or 275, be recovered by the Trustee pursuant to, and to the extent permitted by, NYDCL § 278;

Y.      Disallowing, in accordance with 11 U.S.C. § 502(d), any claims held by Cambridge Securities and/or its assignee until Cambridge Securities satisfies the judgment in respect of the Aaserod Pension Payment, the Karro Pension Payment, the Project Octane Payments, and the Post-Petition Aaserod Pension Payment;

Z.     Disallowing, in accordance with 11 U.S.C. § 502(j), any claims held by Cambridge Securities and/or its assignee until Cambridge Securities satisfies the judgment in respect of the Aaserod Pension Payment, the Karro Pension Payment, the Project Octane Payments, and the Post-Petition Aaserod Pension Payment;

AA.    Awarding pre-judgment interest at the maximum legal rate running from the date of Aaserod Pension Payment, the Karro Pension Payment, the Project Octane Payments, the Post-Petition Aaserod Pension Payment, the Additional Headquarters Pension Payments, the Headquarters Aaserod Tax Gross Up Payment, the Headquarters Securities Payments, and the Eisenberg Payment, to the date of judgment herein;

BB.    Awarding post judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

CC.    Requiring Cambridge Securities to pay forthwith the judgment amount awarded in favor of the Trustee;

DD.    Granting the Trustee such other and further relief as the Court deems just and proper.

As to all relevant Counts, that the Court enter judgment against Eisenberg:

EE.    That the Eisenberg Payment, avoidable under NYDCL §§ 273, 274, and/or 275, in the total aggregate amount of not less than $350,000.00, be avoided to the extent permitted by the NYDCL;

FF.    That the Eisenberg Payment, to the extent it is avoided pursuant to NYDCL §§ 273, 274, and/or 275, be recovered by the Trustee pursuant to, and to the extent permitted by, NYDCL § 278;

GG.    Awarding pre-judgment interest at the maximum legal rate running from the date of the Eisenberg Payment, to the date of judgment herein;

HH.      Awarding post judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

II.      Requiring Eisenberg to pay forthwith the judgment amount awarded in favor of the Trustee;

JJ.      Granting the Trustee such other and further relief as the Court deems just and proper.

Dated:      New York, New York
November 26, 2013

/s/ Andrew N. Goldman
Andrew N. Goldman
Charles C. Platt
Michael G. Bongiorno

WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel: (212) 230-8800
Fax: (212) 230-8888

*Counsel to Liquidating Trustee*

**Exhibit A**

| DATE | AMOUNT | FROM | TO | FOR WHOSE BENEFIT |
|------|--------|------|----|--------------------|
| **Aaserod Pension Payment** | | | | |
| November 16, 2011 | $1,200,000.00 | Getty Petroleum Marketing, Inc. | Cambridge Securities | Aaserod |
| **Karro Pension Payment** | | | | |
| November 16, 2011 | $600,000.00 | Getty Petroleum Marketing, Inc. | Cambridge Securities | Karro |
| **Aaserod Tax Gross Up Payments** | | | | |
| November 28, 2011 | $388,500.00 | Getty Petroleum Marketing, Inc. | United States Treasury | Aaserod |
| November 28, 2011 | $168,500.00 | Getty Petroleum Marketing, Inc. | New York State Income Tax | Aaserod |
| November 28, 2011 | $59,500.00 | Getty Petroleum Marketing, Inc. | New York City Department of Finance | Aaserod |
| November 28, 2011 | $4,850.00 | Getty Petroleum Marketing, Inc. | Commission of Taxation and Finance | Aaserod |
| **Karro Tax Gross Up Payments** | | | | |
| November 28, 2011 | $200,000.00 | Getty Petroleum Marketing, Inc. | United States Treasury | Karro |
| November 28, 2011 | $100,000.00 | Getty Petroleum Marketing, Inc. | New York State Income Tax | Karro |
| **Project Octane Payments** | | | | |
| March 22, 2011 | $91,000.00 | Getty Petroleum Marketing, Inc. | Cambridge Securities | Aaserod and Karro |
| September 20, 2011 | $900,000.00 | Getty Petroleum Marketing, Inc. | Cambridge Securities | Aaserod and Karro |

# Exhibit A

| DATE | AMOUNT | FROM | TO | FOR WHOSE BENEFIT |
|---|---|---|---|---|
| **AMEX Payments[1]** | | | | |
| April 15, 2011 | $2,410.60 | Getty Petroleum Marketing, Inc. | American Express | Aaserod |
| June 20, 2011 | $5,274.30 | Getty Petroleum Marketing, Inc. | American Express | Aaserod |
| July 22, 2011 | $10,397.20 | Getty Petroleum Marketing, Inc. | American Express | Aaserod |
| August 22, 2011 | $26,370.20 | Getty Petroleum Marketing, Inc. | American Express | Aaserod |
| September 23, 2011 | $18,848.50 | Getty Petroleum Marketing, Inc. | American Express | Aaserod |
| October 24, 2011 | $4,321.50 | Getty Petroleum Marketing, Inc. | American Express | Aaserod |
| **Headquarters Karro Pension Payment** | | | | |
| January 24, 2012 | $236,000.00 | Cambridge Petroleum Headquarters, LLC | Karro | Karro |
| **Additional Headquarters Pension Payments** | | | | |
| January 24, 2012 | $336,000.00 | Cambridge Petroleum Headquarters, LLC | Cambridge Securities | Aaserod and/or Karro |
| August 2012 | $61,000.00 | Cambridge Petroleum Headquarters, LLC | Cambridge Securities | Aaserod and/or Karro |
| **Headquarters Aaserod Tax Gross Up Payment** | | | | |
| April 20, 2012 | $212,550.00 | Cambridge Petroleum Headquarters, LLC | Cambridge Securities | Aaserod |
| **Headquarters Karro Tax Gross Up Payment** | | | | |
| April 20, 2012 | $116,950.00 | Cambridge Petroleum Headquarters, LLC | Karro | Karro |

---

[1] The amounts of the AMEX Payments reflected on this Exhibit A represent only charges that were for personal expenditures. The amounts of the actual payments made from GPMI to American Express on these dates were greater than the amounts reflected on this Exhibit A and included non-personal expenditures of the Defendants and other GPMI personnel.

# Exhibit A

| DATE | AMOUNT | FROM | TO | FOR WHOSE BENEFIT |
|------|--------|------|-----|-------------------|
| **Headquarters Securities Payments** | | | | |
| November 8, 2011 | $450,000.00 | Cambridge Petroleum Headquarters, LLC | Cambridge Securities | Cambridge Securities, Aaserod and/or Karro |
| November 15, 2011 | $550,000.00 | Cambridge Petroleum Headquarters, LLC | Cambridge Securities | Cambridge Securities, Aaserod and/or Karro |
| December 3, 2011 | $250,000.00 | Cambridge Petroleum Headquarters, LLC | Cambridge Securities | Cambridge Securities, Aaserod and/or Karro |
| **Eisenberg Payment** | | | | |
| December 3, 2011 | $350,000.00 | Cambridge Petroleum Headquarters, LLC | Eisenberg & Carton | Cambridge Securities, Aaserod and/or Karro |
| **Post-Petition Aaserod Pension Payment** | | | | |
| May 25, 2012 | $121,627.00 | Getty Petroleum Marketing, Inc. | Cambridge Securities | Aaserod |
| **Post-Petition Karro Pension Payment** | | | | |
| May 24, 2012 | $69,085.00 | Getty Petroleum Marketing, Inc. | Karro | Karro |

Getty Petroleum Marketing, Inc.
Business Platinum Card
Account Ending 2-71004
Scott Karro, Card Ending 2-71533

| Statement Ending | Transaction Date | Payee (part 1) | Payee (part 2) | Passenger (if applicable) | Description | | BA Airfare Amount |
|---|---|---|---|---|---|---|---|
| 04/08/11 | 03/31/11 | IcelandAir - Arc US Reykjavik | IcelandAir US BSP | Bjorn Aaserod | From NYC to Reykjavik to Oslo to Reykjavik to NYC | $ | 2,493.00 |
| 04/08/11 | 03/31/11 | IcelandAir - Arc US Reykjavik | IcelandAir US BSP | Lola Aaserod | From NYC to Reykjavik to Oslo to Reykjavik to NYC | $ | 2,493.00 |
| 05/10/11 | 04/04/11 | IcelandAir - Arc US Reykjavik | IcelandAir US BSP | Bjorn Aaserod | Refund for 3/31 IcelandAir ticket | $ | (1,287.70) |
| 05/10/11 | 04/04/11 | IcelandAir - Arc US Reykjavik | IcelandAir US BSP | Lola Aaserod | Refund for 3/31 IcelandAir ticket | $ | (1,287.70) |
| 06/09/11 | 05/27/11 | Delta Airlines, Inc. | Tzell/Carber Travel | Cynthia Aaserod | From NYC to Paris to Naples to Rome to NYC | $ | 2,575.80 |
| 06/09/11 | 05/27/11 | Travel Agency Service | Tzell/Carber Travel | Bjorn Aaserod | Service fee | $ | 100.00 |
| 06/09/11 | 05/27/11 | Travel Agency Service | Tzell/Carber Travel | Cynthia Aaserod | Service fee | $ | 100.00 |
| 06/09/11 | 05/27/11 | Tzell/Carber Travel | Meridiana | Bjorn Aaserod | From NYC to Naples | $ | 2,498.50 |
| 07/10/11 | 07/07/11 | Tzell/Carber Travel | Travel Agency Service | Bjorn Aaserod | Service fee | $ | 50.00 |
| 07/10/11 | 07/07/11 | Tzell/Carber Travel | Travel Agency Service | Cynthia Aaserod | Service fee | $ | 50.00 |
| 07/10/11 | 07/07/11 | Tzell/Carber Travel | Travel Agency Service | Clarissa Aaserod | Service fee | $ | 50.00 |
| 07/10/11 | 07/07/11 | Tzell/Carber Travel | Travel Agency Service | Lola Aaserod | Service fee | $ | 50.00 |
| 07/10/11 | 07/07/11 | British Airways ADP | British Airways PLC | Bjorn Aaserod | From Newark to Paris to Newark | $ | 2,549.30 |
| 07/10/11 | 07/07/11 | British Airways ADP | British Airways PLC | Cynthia Aaserod | From Newark to Paris to Newark | $ | 2,549.30 |
| 07/10/11 | 07/07/11 | British Airways ADP | British Airways PLC | Clarissa Aaserod | From Newark to Paris to Newark | $ | 2,549.30 |
| 07/10/11 | 07/07/11 | British Airways ADP | British Airways PLC | Lola Aaserod | From Newark to Paris to Newark | $ | 2,549.30 |
| 08/10/11 | 07/13/11 | Tzell/Carber Travel | Air France | Clarissa Aaserod | From Paris to Nice to Paris | $ | 574.50 |
| 08/10/11 | 07/13/11 | Tzell/Carber Travel | Air France | Bjorn Aaserod | From Paris to Nice to Paris | $ | 710.50 |
| 08/10/11 | 07/13/11 | Tzell/Carber Travel | Air France | Cynthia Aaserod | From Paris to Nice to Paris | $ | 710.50 |
| 08/10/11 | 07/13/11 | Tzell/Carber Travel | Air France | Lola Aaserod | From Paris to Nice to Paris | $ | 574.50 |
| 08/10/11 | 07/13/11 | Tzell/Carber Travel | Travel Agency Service | Bjorn Aaserod | Service fee | $ | 40.00 |
| 08/10/11 | 07/13/11 | Tzell/Carber Travel | Travel Agency Service | Cynthia Aaserod | Service fee | $ | 40.00 |
| 08/10/11 | 07/13/11 | Tzell/Carber Travel | Travel Agency Service | Clarissa Aaserod | Service fee | $ | 40.00 |
| 08/10/11 | 07/13/11 | Tzell/Carber Travel | Travel Agency Service | Lola Aaserod | Service fee | $ | 40.00 |
| 08/10/11 | 07/31/11 | British Airways ADP | British Airways PLC | Bjorn Aaserod | From Paris to Newark | $ | 4,525.50 |
| 08/10/11 | 07/31/11 | British Airways ADP | British Airways PLC | Cynthia Aaserod | From Paris to Newark | $ | 4,525.50 |
| 08/10/11 | 07/31/11 | British Airways ADP | British Airways PLC | Clarissa Aaserod | From Paris to Newark | $ | 4,525.50 |
| 08/10/11 | 07/31/11 | British Airways ADP | British Airways PLC | Lola Aaserod | From Paris to Newark | $ | 4,525.50 |
| 08/10/11 | 08/04/11 | Tzell/Carber Travel | Travel Agency Service | Bjorn Aaserod | Service fee | $ | 40.00 |
| 08/10/11 | 08/04/11 | Tzell/Carber Travel | Travel Agency Service | Cynthia Aaserod | Service fee | $ | 40.00 |
| 08/10/11 | 08/04/11 | Tzell/Carber Travel | Delta Airlines, Inc. | Bjorn Aaserod | From NYC to Boston | $ | 688.70 |
| 08/10/11 | 08/04/11 | Tzell/Carber Travel | US Airways, Inc. | Cynthia Aaserod | From NYC to Boston | $ | 688.70 |
| 08/10/11 | 08/08/11 | Tzell/Carber Travel | Virgin Atlantic Airways | Bjorn Aaserod | From NYC to London to Oslo to London to NYC | $ | 3,980.80 |
| 08/10/11 | 08/08/11 | Tzell/Carber Travel | Travel Agency Service | Bjorn Aaserod | Service fee | $ | 100.00 |
| 09/09/11 | 08/12/11 | Tzell/Carber Travel | Travel Agency Service | Cynthia Aaserod | Service fee | $ | 100.00 |
| 09/09/11 | 08/12/11 | Tzell/Carber Travel | Travel Agency Service | Bjorn Aaserod | Service fee | $ | 40.00 |
| 09/09/11 | 08/12/11 | Tzell/Carber Travel | Travel Agency Service | Clarissa Aaserod | Service fee | $ | 100.00 |
| 09/09/11 | 08/12/11 | Tzell/Carber Travel | Travel Agency Service | Lola Aaserod | Service fee | $ | 100.00 |
| 09/09/11 | 08/12/11 | Scandinavian Airline | Scandinavian Airlines SYS | Bjorn Aaserod | From Newark to Oslo to Stockholm to Newark | $ | 3,657.50 |
| 09/09/11 | 08/12/11 | Scandinavian Airline | Scandinavian Airlines SYS | Cynthia Aaserod | From Newark to Oslo to Newark | $ | 2,076.50 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | **Exhibit B: AMEX Payments** | | | | | |
| 09/09/11 | 08/12/11 | Scandinavian Airline | Scandinavian Airlines SYS | Clarissa Aaserod | From Newark to Oslo to Newark | $ | 2,076.50 |
| 09/09/11 | 09/02/11 | Tzell/Carber Travel | Travel Agency Service | Bjorn Aaserod | Service fee | $ | 50.00 |
| 09/09/11 | 09/02/11 | Tzell/Carber Travel | Travel Agency Service | Cynthia Aaserod | Service fee | $ | 50.00 |
| 09/09/11 | 09/02/11 | Tzell/Carber Travel | Travel Agency Service | Clarissa Aaserod | Service fee | $ | 50.00 |
| 09/09/11 | 09/02/11 | Tzell/Carber Travel | Travel Agency Service | Lola Aaserod | Service fee | $ | 50.00 |
| 09/09/11 | 09/02/11 | Scandinavian Airline | Scandinavian Airlines SYS | Bjorn Aaserod | From Newark to Oslo to Newark | $ | 2,804.00 |
| 09/09/11 | 09/02/11 | Scandinavian Airline | Scandinavian Airlines SYS | Cynthia Aaserod | From Newark to Oslo to Newark | $ | 2,804.00 |
| 09/09/11 | 09/02/11 | Scandinavian Airline | Scandinavian Airlines SYS | Clarissa Aaserod | From Newark to Oslo to Newark | $ | 2,445.00 |
| 09/09/11 | 09/02/11 | Scandinavian Airline | Scandinavian Airlines SYS | Lola Aaserod | From Newark to Oslo to Newark | $ | 2,445.00 |
| 10/10/11 | 09/21/11 | Tzell/Carber Travel | Jet Airways | Bjorn Aaserod | From Newark to Brussels to Oslo to Brussels to Newark | $ | 4,221.50 |
| 10/10/11 | 09/21/11 | Tzell/Carber Travel | Travel Agency Service | Bjorn Aaserod | Service fee | $ | 100.00 |
| | | | | | **TOTAL:** | $ | 67,622.30 |